### SANCHEZ, plaintiff in error, v. THE PEOPLE.

In an indictment for murder, the place of the mortal wound is sufficiently indicated by the allegation, that it was "upon the body."

This, *it seems*, means the trunk, in contradistinction from the head or limbs; but whether it does or not, it is a matter of mere form and immaterial.

When the judge acts as trior, upon the challenge of a juror for favor, his decision upon the question of fact is not reviewable.

Evidence of information to the prisoner, of his wife's adultery, is admissible to show that he committed the murder in a state of frenzy, only where the offer is to show the information so near the time of committing the crime, that the court can see there was not a sufficient period for the passion, it would naturally excite, to subside.

Upon the question of insanity, the *doubt* of an expert is not admissible in evidence.

WRIT of error to Supreme Court. The plaintiff in error was indicted in the Court of General Sessions of the city and county of New York, in March, 1859, for the murder of Harmon Curnon, and was tried and convicted of murder in the same court, in June following. Judgment and sentence of death was pronounced upon him, to be executed on the 22d day of July then next. After the verdict was rendered and before judgment was pronounced, a motion was made on behalf of the prisoner in arrest of judgment, which motion was denied by the General Sessions. A writ of error was afterwards brought upon the judgment to the Supreme Court, and proceedings upon the judgment were stayed. The Supreme Court, sitting in the first district, at a general term thereof held in October, 1859, affirmed the judgment of the General Sessions; whereupon the present writ of error was sued out.

*William H. Anthon,* for plaintiff in error.

*Nelson J. Waterbury,* for the People, defendants in error.

WELLES, J. The first question raised upon the argument here, relates to the sufficiency of the indictment.

The indictment charges the commission of the murder in the following words: "And that the said Felix Sanchez, with a certain sword which he the said Felix Sanchez, in his right hand then and there had and held, the said Harmon Curnon, in and upon the body of him the said Harmon Curnon, then and there willfully and feloniously, and of his malice aforethought, did stab, cut and wound, giving unto the said Harmon Curnon then and there with the sword aforesaid, in and upon the body of him the said Harmon Curnon, one mortal wound, of the breadth of one inch, and of the depth of three inches, of which said mortal wound he the said Harmon Curnon, at the ward, city and county aforesaid, then and there instantly died."

The indictment does not otherwise show upon what part of the body of Curnon the mortal wound was given; and the counsel for the plaintiff in error now contends that the omission is fatal.

The indictment, in my opinion, is sufficiently certain in this respect. By the word body, in this connection, is to be understood the trunk of the man, in distinction from his head and limbs. This is the doctrine of the books on the subject. (*Long's Case*, Coke's R., pt. 5, 120.)

It is usual to state the particular part of the body upon which the violence producing the death was inflicted; and in some of the old authorities it is said that the charge or statement of the crime in the indictment should be so precise in this respect, that from such statement you could lay your finger on the particular spot. But this strictness has given way to a more sensible and practical rule. The object of an indictment is to give to the party accused reasonable notice of the crime with which he is charged, in order that he may prepare his defence and be protected against a second trial for the same offence. Neither of these objects are attained or approached by requiring specifications which need not be proved; and it is well settled that an allegation that the wound was inflicted on one part of the body is sustained by evidence showing that it was on another and different part. For example, a charge that the wound was made on the right side of the body is sustained by evidence that it was on the left side. (Russ. on Cr., vol. 1, pp. 558-562, 5 Am. from 3 Lond. ed., and authorities there cited), and the same rule applies in respect to the length and depth of the wound.

But assuming the common law rule to require the indictment to state the particular part of the body where the mortal wound was inflicted, the consideration that the public prosecutor is not obliged to prove that it was in the part of the body as charged, and that such allegation is sustained by evidence that it was inflicted elsewhere on the body, proves that it is a matter of form, so far as relates to the place upon the body where the wound was inflicted; and the Revised Statutes

provide that "no indictment shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be affected : "

1st. "By reason," &c.    *    *    *    4th. "By reason of any other defect or imperfection in matters of form which shall not tend to the prejudice of the defendant." (1 R. S., 728, § 52.)

Now it is impossible to conceive how the defect or omission complained of could tend to prejudice the plaintiff in error. (*The People* v. *Powers*, 2 Seld., 50.) The substance of the crime is stated; and if it had been alleged that the wound had been inflicted upon the forepart of the body, as was done and held sufficient in Long's case—"*super anteriorem partem corporis*" (5 R., 120)—it is not perceived how any substantial right of the plaintiff in error would have been thereby secured or protected.

A number of exceptions were taken at the trial by the prisoner's counsel to rulings and decisions of the court, which are now urged as grounds for reversing the judgment and conviction. These will be considered in their order.

John S. Tuttle was called as a juror, and was challenged for principal cause on the part of the prisoner. I infer from the bill of exceptions that the ground of the challenge was, that he had formed or expressed an opinion touching the guilt or innocence of the prisoner. This challenge, as the bill of exceptions states, was denied by the counsel for the People. Tuttle testified that he had not formed or expressed any such opinion, and the principal challenge was overruled by the court. The prisoner's counsel then challenged the said Tuttle for favor; whereupon the counsel on both sides agreed that the court should act as trior, and Tuttle further testified that he had read part of the statement in the papers at the time of the homicide, and had formed a preconceived idea in regard to the prisoner's guilt or innocence; that he had no bias one way or the other; that his preconceived idea or impression would in no way influence his verdict, but he would be governed entirely by the evidence produced on the stand. The court thereupon found the last mentioned challenge untrue, and overruled the same; to which decision the prisoner's counsel excepted, and Tuttle

was sworn as a juror to try the cause. The counsel for the plaintiff in error now contends that the court erred in over-ruling this challenge to the favor.

We must regard the question in the same light as if the challenge had been decided by triors duly appointed by the court in the ordinary way. The prisoner's counsel and the district attorney had, by mutual agreement, substituted the court as triors; and the same rules should apply in conducting the trial of the challenge and in reviewing the same, as govern in cases where such challenge is determined by triors appointed by the court. In such case it is clearly settled by authority, that the decision of the triors is final upon the question of fact whether the juror stands indifferent; which is, in all cases, the question to be decided by the triers. (*The People* v. *Bodine*, 1 Denio, 308, 309, and authorities there cited.) They are to hear such evidence as may be laid before them, and a bill of exceptions will not lie to correct any error in their finding. Any decision by the court in admitting or rejecting evidence offered upon the question of bias in the mind of the juror, might be brought up for review by bill of exceptions; but that is not this case, as there was no exception to any such decision, the evidence having been received without objection, and the exception standing solely upon the decision of the fact upon the evidence. That decision was final and cannot be reviewed.

Sarah Jane Sanchez, the wife of the prisoner, was introduced and examined as a witness, by the prisoner, with the consent of the district attorney. His object in producing her as a wit-ness seems to have been, to prove that he was under the influ-ence of jealousy of his wife at the time he committed the homicide, and had accused her of improper intercourse with a man named Annisetto Lajeunechette, and of being a prostitute, &c. She testified in relation to a difficulty and dispute—which took place on the evening, and just before the homicide was committed—between her and the prisoner, respecting the merits of a song which she had sung that evening; the prisoner alleg-ing it was not a decent song, and the witness contending that

it was; when she proposed to call her mother and ask her; upon which the prisoner said, If you do, I'll cut your throat; that he did not accuse her of having improper intercourse with the said Lajeunechette. The prisoner's counsel then asked the witness whether she did not state before the coroner, when examined at the inquest, as follows: " My husband accused me of having improper intercourse with a man named Annisetto Lajeunechette, and threatened that, unless I told the truth, he would stab me; he accused me of being a prostitute; I was sitting up in bed, crying at the time; my mother knocked at the door on account of his remarks; I heard her burst in the door?" The counsel for the people objected to this question and the court sustained the objection, to which decision the prisoner's counsel excepted.

The question, in my opinion, was objectionable. The evidence sought to be elicited by it could have no legal bearing upon the issue, which was, whether the prisoner was guilty of the murder of Harmon Curnon; and it is not perceived how, if the question had been answered in the affirmative, any light would have been thereby shed upon the issue. Besides, it was a direct attempt by the prisoner to discredit his own witness, which the law will not permit.

The said Annisetto Lajeunechette was produced as a witness by and on behalf of the prisoner, and testified in relation to his acquaintance and friendly intercourse with the deceased and his family, and with the prisoner and his wife. He testified that he never saw the wife of the prisoner alone; that he did not know of any person visiting her before her marriage; that he had never slept with her; that he had never had connection with her, and never thought of it; and that he never knew of any one coming to the house where she was, at night.

The prisoner's counsel then asked the witness the following question: "Did you at any time after the marriage of Sanchez give him any information of his wife's infidelity to him; and if so, when?" The counsel for the People objected to the question and the objection was sustained, to which the prisoner's counsel excepted. A similar question was put by the pri-

soner's counsel to another witness called by him, by the name of Tibulcio Aguillar, which was overruled by the court on being objected to by the counsel for the People, and the prisoner's counsel excepted. The questions put to these two witnesses were clearly improper. Assuming the theory of the defence to have been, as the prisoner's counsel alleges, that the homicide was committed by the prisoner in an insane frenzy, superinduced by jealousy awakened in his mind in relation to his wife's conjugal infidelity—which would reduce the offence from murder to manslaughter—and that such theory was a sound one, the inquiry should have been confined to the time and occasion of the homicide, or within a period so shortly before, that the court could see that the passions had not, or might not have, had time to subside. The questions to each of these witnesses related to an indefinite period of time between the prisoner's marriage and the homicide; and therefore, if for no other reason, were clearly inadmissible. (1 Russ. on Cr., 525; *The King* v. *Oneby*, 2 Raym., 1485; *The Queen* v. *Fisher*, 8 Carr. & Payne, 182; *The Queen* v. *Kelly*, 2 Carr. & Kirw., 814.)

It appeared by the testimony of the witness Aguillar, that he saw Lajeunechette shortly after the homicide at the store of the witness, in Pearl street, and had a conversation with him about this case. The prisoner's counsel then put the following question to him: "Did he on that occasion state to you that he had slept with Mrs. Sanchez on the night of the 5th of January?" This question was overruled by the court on objection by the counsel for the People, to which the prisoner's counsel excepted. The only imaginable reason for asking this question, was to impeach the credit of Lajeunechette, whom the prisoner had called and examined, and who had undoubtedly given evidence different from what he expected, and contrary to what he was seeking to prove, to wit: the licentious conduct of his wife. This was not a sufficient reason, and the objection was rightfully sustained.

Doctor Ranney, another witness introduced by the prisoner, testified that he was resident physician of the lunatic asylum at Blackwell's Island; that he had heard part of the testimony

of Mrs. Sanchez and her mother, and of one or two other witnesses; that he examined Sanchez on the 6th and 9th of the month of the trial, perhaps about three hours; that as a general principle, where a homicide has been committed and it can be determined that there is no motive, he should consider it evidence of homicidal mania, but that it was extremely difficult to determine the absence of all motive. The prisoner's counsel then put the following question to the doctor: "Judging from your knowledge of Sanchez's temperament, and from the facts and circumstances of this case, as you have heard them described in the testimony, do you believe that at the time of the homicide, he was mentally capable of forming a premeditated design to take away life?" The witness answered as follows: "It is a difficult point to decide; if the inception of the idea was immediately followed out, there could, of course, be no premeditation." Question by the prisoner's counsel: "Have you doubts as to that subject in this case?" To this question the counsel for the People objected, and the court sustained the objection, to which the prisoner's counsel excepted.

I entertain no doubt of the correctness of this decision. The question put to the witness upon which the exception arose was improper, for the following reasons: 1st. It called for an answer to be founded upon a limited and partial view of the case. The witness had heard only a part of the evidence upon the point upon which he was called upon to testify. If the previous question was obnoxious to the same objection, the fact that the counsel for the People did not take advantage of it then, forms no reason for holding him concluded, when the error was about being repeated; especially when the witness, instead of answering the question put to him, had undertaken to decide the law, and that erroneously. (*The People* v. *Clark*, 3 Seld., 385–394.)

2d. It sought to prove, not an opinion, but the absence of one, to prove a doubt. The rule of evidence is sufficiently liberal to persons charged with crime, in permiting witnesses skilled in the diseases of the mind to testify to their opinions,

formed upon an adequate knowledge of the case, as to whether the mental condition of the accused was such at the time of the commission of the alleged offence, as to enable him to judge between right and wrong, or to premeditate its commission. (*McNaughton's Case*, 10 Clark & Fin., 210, cited in 2 Gr. Ev., note to § 373.) It is the first time I have ever heard of a case, where a party seeking to establish the defence of insanity, or to prove the existence of the fact, offered evidence by an expert witness, to show that he, the witness, entertained doubts upon the question.

I have thus gone through with and considered all the exceptions taken at the trial which the counsel for the plaintiff in error has deemed it proper to present for the consideration of this court, and have not been able to discover that any error has been committed by the Court of General Sessions.

Under the statute of 1855, chapter 337, section 3, as amended by chapter 330, Session Laws of 1855, we are bound to review the case upon the facts, and are authorized to order a new trial, if satisfied that the verdict is against the weight of evidence or against law, or that justice requires a new trial. I have, therefore, carefully examined and considered all the evidence, and am satisfied that the verdict should not be disturbed, either upon the facts of the case, or upon the law as it existed at the time the judgment was rendered.

But the judgment must, nevertheless, be reversed, in consequence of the legislation of last winter on the subject of capital punishment. (Laws of 1860, ch. 410; *Hartung* v. *The People, ante, p.* 95.)

The judgment of the Supreme Court and that of the Court of General Sessions must be reversed, and a new trial ordered.

CLERKE, J. (Dissenting, as to some of the points decided, though concurring in the result.) In deciding that the indictment in this case was not defective: in overruling the challenge of the juror for favor: in not allowing the question to be put to Sarah Jane Sanchez, as to the facts to which she had testified before the coroner: in not allowing the question to be

put to Dr. Ranney, as to his doubts of the prisoner's mental capacity to form a premeditated design to take away life; I agree with the Supreme Court, in thinking that the judge, before whom this cause was tried at the Sessions, decided correctly. On the other exceptions, however, I have arrived at a different conclusion.

The wife of the prisoner having been examined by consent testified before the coroner that, a few months before the fatal act, her husband had accused her of having improper intercourse with a man named Annisetto Lajeunechette; and the theory of the defence is, that not long before, he had received information of her infidelity from Lajeunechette himself, or from some other person; that this information, operating upon an excitable and jealous temperament, infuriated him to so great a degree as to deprive him, momentarily, of reason, and that in this state of frenzy, he committed the deed for which he was indicted.

Lajeunechette was produced and examined at the trial, on behalf of the prisoner, and, among other questions, was asked whether, at any time after the marriage of Sanchez, he had given him any information of his wife's infidelity, and if so, when. The counsel for the People objected to the question, and the objection was sustained.

We must bear in mind that the defendant was under trial for murder, and that the jury convicted him of that offence.

By the Revised Statutes, the killing of a human being is murder: 1st. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being. 2d. When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual. And, 3d. When perpetrated, without any design to effect death, by a person engaged in the commission of a felony. In other words, to employ the common law definition, murder is the killing of any person with malice prepense, or aforethought, either express or implied. Malice is implied in every unlawful killing, and, as a

general rule, all homicide is presumed to be malicious, and, of course, to amount to murder, until the contrary appears from circumstances of alleviation, excuse or justification.

Of the description contained in the Revised Statutes, and in the common law definition, premeditated design, malice prepense, is the chief characteristic by which murder is to be distinguished from any other kind of homicide. This premeditated design, however, may be matured in a minute, as well as in an hour or a day; it may, although the product of an instantaneous conception, be, nevertheless, a deliberate, willful and premeditated killing. But, in inquiring into the existence of this design, it is, plainly, necessary and proper to inquire, whether the person committing the act was capable of premeditation. Premeditation presupposes the consent of the will; without which, human actions cannot be considered culpable. The instances in which the law supposes a want or defect of will are numerous; such as infancy, lunacy, subjection to the power of others, and ignorance of facts, as where a man intending to kill a thief, or a house breaker in his own house, by mistake kills one of his own family. A state of intoxication of itself, indeed, does not necessarily incapacitate a man from forming a premeditated design; it is rather an aggravation of the offence, when, in order to cloud his conscience, and nerve his resolution, he becomes intoxicated. But, still, as intoxication unsettles the understanding and excites the passions, it may be evidence of the want of malice or design. In other words, it may or may not produce this incapacity to form a premeditated design, of which the jury shall judge from the circumstances of each particular case. In *The People* v. *Eastwood* (4 Kern., 562), it is expressly held, "if one has lost his senses, and become insane, he has ceased to be accountable to the criminal law, whether the loss of intellect was caused by misfortune, or his own imprudence in the use of intoxicating liquors, or by any willful act of his own. The loss of intellect takes away the faculty of possessing that design, what is an essential part of the offence of murder. So, if any other condition of the man deprives him of the power

of knowing what he does, or of entertaining a design in acting, he cannot commit any offence of which design is an essential element." This incapacity, then, extends to any mental condition, by which a man is deprived of the power of knowing what he does, or the effect of what he does.

Like intoxication, jealousy is not of itself an excuse for murder; but can there be any reason, if it pervades the mind to such a degree as to unsettle the understanding and dethrone the will, that it should not, like intoxication, be proper evidence tending to show that the prisoner was not capable of forming the premeditated design, which is an essential element in the crime of murder? Of all the emotions which agitate the human mind, that of jealousy is the most overpowering. The horror, that fills the mind, on the discovery of the infidelity of a beloved object, produces a tumult which permits nothing to be felt but the commotion itself. Perplexed and disquieted by the flux and reflux of conflicting emotions, the mind is utterly bewildered, is incapable of control, and is often, indeed generally, in a state of moral unconsciousness. While the paroxysm lasts, the unhappy subject of it is certainly as incapable of forming a deliberate intent to commit a crime, as any person in a state of intoxication. But, it may be said, would not this be an excuse for almost every act of violence? Is not every outrage prompted by passion? Is not the man to be excused, who, feeling a real or imaginary insult or wrong, of any description, shoots or stabs his victim, whenever he has an opportunity, because he also is under the influence of passion? Undoubtedly, whatever may be the cause of the passion, if it produces a sudden paroxysm, rendering its subject incapable of distinguishing between right and wrong, he should be excused; and this capacity is precisely what the jury have to determine. If the killer, however great may be the provocation, or the impetuosity of his passion, lays his plans ingeniously and cautiously, calmly awaits his opportunity, or, even, if he commits the violence immediately on receiving the insult or information of the wrong, but, nevertheless, shows a deliberate purpose under the control of the will, he is responsible for

the act, and must suffer the penalty. But it is for the jury, I repeat, to determine his capacity, and I readily say with Chief Justice MANSFIELD in *Billingham's case*, that "in order to support such a defence, it ought to be proved by the most distinct and unquestionable evidence." The jury, however, under the charge of the court, are alone to judge of its efficacy, and no evidence should be excluded from them, that has any tendency to establish this defence. .

The counsel for the prosecution maintains that the question put to Lajeunechette only concerned information given to the prisoner, not the actual condition of his mind. But, if it was proper to show the actual condition of his mind, it was equally proper to · show anything calculated to produce that condition ;—leaving it to the jury, under all the circumstances, to determine its effect.

It may be objected, that the question under consideration was too general—that it should have specified time and circumstances, so as to show whether it was intended to prove, that the prisoner received the alleged information, relative to his wife's infidelity, at a time sufficiently near the period at which the homicide was committed. The answer to this is, that the objection to the question was not placed upon this ground. It was the duty of the district attorney to do this; if he specified the ground of his objection, the counsel for the prisoner would probably have confined his question to it.

I think, therefore, that the judge erred in not allowing the question to be put to Lajeunechette, and, for the same reasons, in not allowing the question proposed to be put to Tibulcio Aguillar.

Whether there was error in not allowing the question to be put to Tibulcio Aguillar as to previous statements of facts made by Lajeunechette, different from those made by him on the stand, is a more difficult question.

As a general rule, a party is not permitted to discredit his own witness by general evidence,—that is, he cannot prove him to be of such a general bad character, as would render him unworthy of credit. A party is not precluded from proving

the truth of any particular fact by any other competent testimony, in direct contradiction to what his own witness might have testified; but whether he can prove that the witness had previously stated the facts in a different manner is, according to Greenleaf, a question upon which there exists some diversity of opinion (1 Greenleaf's Ev., § 444); although Phillipps in his treatise considers it well settled, that a party cannot show that a witness whom he has called, has been heard, at other times, to make a different representation.

We have not been referred to any decision, nor do I know of any in this State upon this precise point, nor, indeed, am I aware of any current of authority upon it, anywhere. The cases, to which we have been referred, merely show that a party calling a witness is not precluded from proving the truth of any particular fact, by any other competent testimony, in direct contradiction to what such witness has testified.

It is urged, in favor of excluding proof of contradictory statements, previously made by a witness, whom the party has called, that to admit such proof would enable him to get the naked declarations of a witness before the jury, operating in truth as independent evidence; while in favor of admitting such evidence, it is urged that a party is not to be sacrificed to his witness: that he is not represented by him, nor identified with him; and that he ought not to be entrapped by the arts of a designing man, perhaps in the interest of his adversary.

The general rule laid down by Hawkins is, "what a witness hath been heard to say, at another time, may be given in evidence, in order either to invalidate or confirm the testimony, which he gives in court." (Hawk., b. 2, ch. 46, § 14.) This has been frequently recognized; but has not always been allowed to a party in relation to his own witness. But, the main objection urged against it in such a case is applicable to all cases,—namely, that it would enable the party to get the naked declarations of a witness before the jury, operating in truth as independent evidence. Surely this danger is no greater, where the contradictory declarations are proved by the

Sanchez *v.* The People.

party who calls the witness, than when they are proved by the adverse party.

Nor can I see the philosophy of allowing a party to correct his own witness, even by directly contradicting him by other witnesses, and not allowing him to contradict him, or weaken his credibility before the jury, by previous contradictory statements made by him. The latter is maintained, chiefly, because it would be a violation of the rule, that the party calling the witness shall not impeach him. Does it not invalidate his testimony at least quite as much to contradict him through the mouth of another witness, as through his own?

On the whole, I consider that the interests of justice will be promoted, by allowing every party to correct the testimony of witnesses, whether called by himself or not. Those narrow notions, by which evidence has been hampered and suppressed, and truth gainsaid, are gradually yielding to more comprehensive and to sounder views, and I know of no principle more unjust and more inexpedient, than to conclude a party by whatever his witness swears, without giving him every opportunity of correcting the testimony, if the witness should intentionally or unintentionally swear falsely. Let the jury weigh all.

I, therefore, deem that the court below also erred in not allowing the question to be put to Aguillar, as to previous statements made by the witness Lajeunechette.

The judgment of the Supreme Court should be reversed, and a new trial ordered.

All the judges were for reversal, for the reasons stated in *Hartung* v. *The People* (*ante* p. 95). Upon the exceptions taken at the trial in this case, all the judges were for affirmance except SELDEN and CLERKE, Js.

Judgment reversed, and new trial ordered.