## JEREMIAH O'BRIEN v. THE PEOPLE.

*Disqualifications of Jurors in Capital Cases—Laws 1855, ch. 337.*

The act of 1855 (ch. 337) has not so changed the rule of law, as to permit an error affecting the prisoner's legal rights to be disregarded by the Court of Appeals, even though he be clearly guilty. Such act was passed for the advantage of the accused, so that a new trial might be awarded when substantial justice seemed to require it, although the record disclosed no error of law.

A juror stating that he has conscientious scruples against finding a verdict in a case involving life and death, is confessedly disqualified from sitting as a juror in a case involving life and death; and it is no error for the judge to discharge such person from serving on a jury in a capital case.

General impressions obtained from reading newspaper accounts of transactions do not disqualify the person as a juror sitting to try parties in such transactions.

BOCKES, J.—The Plaintiff in error was convicted in the Court of General Sessions for the city and county of New York, of murder in the first degree, for killing Kate Smith, on the 20th June, 1866.   On writ of error from the Supreme Court the conviction was affirmed, and judgment thereon was directed to be executed; wherefore a writ of error was sued out from this Court, to the end that the case might be considered here.

It appears, from the evidence, that the prisoner had been in relations of criminal intimacy with the deceased, Kate Smith, for several months prior to the 20th June, the day of the homicide; and having become jealous by reason of favors extended by her to another, he had committed violence upon her, for which she had caused his arrest, and a trial or an examination in regard to it was soon to be had.   The deceased occupied a room in a house of ill-fame.   A very short time, about one hour perhaps, prior to the fatal occurrence, the prisoner sent her a letter, excusing his conduct, promising not to repeat the offence, and requesting her to absent herself from the examination.   The deceased returned a reply, not produced, nor was its purport proved.   Soon thereafter the prisoner proceeded to her room, carrying with him a large knife, which, on his way, he took secretly from a fish-stand.   He immediately attacked the deceased, whose

screams brought the inmates of the house to the room. When first seen the parties were on their knees, facing each other, on the floor—the deceased, in great terror, imploring the prisoner to desist and give up the knife. The deceased then darted from him and passed from the room down the stairs, closely followed by the prisoner, who overtook her at the stair-landing, and plunged the knife into her back, causing almost instant death. He was immediately arrested, when he told the officer that he committed the deed, and should plead guilty to save the expense of a trial.

These facts stand clearly and indisputably proved. They present to us a case of unjustifiable homicide, most atrocious and revolting. It was without shadow of excuse or circumstance of palliation. The act was evidently fully designed, was premeditated, and was deliberately carried into effect, in a manner exhibiting the most brutal and heartless depravity.

It seems impossible that the jury could have regarded their oath, and returned any other verdict than guilty of murder in the first degree. Still the prisoner was entitled to a trial in all respects in accordance with the settled rules and forms of law; and if not so tried, his conviction was illegal, and he may demand another hearing before a jury of his country.

We do not understand that the Act of 1855 (chap. 337, page 613) has changed the former rule of law, so as to permit an error affecting the prisoner's legal rights to be disregarded in this Court. However clear his guilt may appear, that act took nothing from the accused, but was passed for his advantage in this, that a new trial might be awarded when substantial justice seemed to require it, even although the record disclosed no error of law. It placed him on the higher plane of substantial right, untrammelled by technical omissions occurring through the ignorance or inadvertence of counsel, and authorized this Court to intervene in his favor, in cases where before it was powerless to grant relief. In this view the Act of 1855 was conceived in a spirit of liberal and enlightened humanity. But it was not intended to authorize, nor does it in terms or by fair construction authorize, this Court to disregard errors, which, prior to its passage, were avail-

able to the accused as grounds for a new trial. These grounds still remain to him, whatever may be his condition of guilt.

We are therefore required to examine the rulings and decisions of the Court in which the trial was had, to see if any error was there committed prejudicial to his right. If the record disclose such error, the conviction should be set aside.

It is first urged that Lewis Friedman, called as a juror, and challenged for principal cause, was improperly set aside by the Court. On his examination he testified that he had conscientious scruples as to finding a verdict in a case involving life and death. He was not, consequently, a competent juror in a case where the prisoner was charged with murder in the first degree. Then he further stated that he was not opposed to the policy of the law inflicting capital punishment, and that his scruples consisted in tender feelings toward the prisoner—a fear that he should do him wrong. The fact, however, still remained, according to his statement, that he had conscientious scruples against finding a person guilty of a crime the penalty of which was death. The grounds for his scruples, or his reasons for them, were of no importance. That they existed was sufficient to exclude him from the panel (32 N. Y. 147, 160–1).

It is next urged that the challenge to Mr. Bluhdorn was improperly overruled. This juror was called and challenged to the favor. On being examined, he stated that he had a faint recollection of hearing of the occurrence through the newspapers at the time, but formed no opinion or positive decision as to the guilt of the prisoner; that the newspaper statement left no particular impression on his mind as to the guilt of the person named, except as a newspaper statement; that he believed a homicide had been committed, and by the person named. This is the substance and import of his examination. It is plain that the challenge was not supported. It did not appear that the juror was prejudiced against the prisoner, or had formed an opinion as to his guilt or innocence, from what he had read or heard; and he was clearly competent, unless general impressions, obtained from reading newspaper accounts of the daily events occurring in our

midst will disqualify the reader from judging impartially of them, when brought under examination, or sworn evidence in a Court of justice. It has been often held that impressions so made do not disqualify a person from sitting as a juror (2 Barb. 222; 1 Park. 302; 2 Park. 16; 4 Park. 132–5–6–7; 5 Park. 414, 423–4–5). Were a different rule to obtain, the most intelligent and upright portion of community would be generally excluded from the jury-box, leaving cases of the highest importance to individuals and to community to be determined by the more ignorant and least competent (3 Denio, 121). But the challenge was for favor, the decision of which, as a question of fact, was final, and the exception unavailing (21 N. Y. 134; 22 N. Y. 147). It is urged that the challenge should have been determined by triors, not by the Court. But the exception was not put on this ground. It was competent for the Court to act as trior upon the challenge to the favor, and it must be assumed that he did so act, by consent of the parties, in the absence of all objections or request to submit the question to triors (4 Wend. 231; 21 Wend. 509; 4 Park. 132). It was decided in the case cited (The People *v.* Mather, 4 Wend. 231), that, " When the facts on which a challenge rests are disputed, the proper course is to submit the question to triors; but if neither of the parties asks for triors to settle the issue of fact, and submit their evidence to the judge, and take his determination thereon, they cannot afterward object to his competence to decide that issue. The production of evidence to the judge, without asking for triors, will be considered as the substitution of him in place of triors; and his decision will be treated in like manner as would the decision of triors."

It seems, therefore, that there is no ground on which to predicate error on the decision of the Court overruling the challenge interposed against the juror Bluhdorn. No other suggestions of error are now made to the forming of the jury, except the two above considered. Others were urged in the Court below, but not being here insisted on, we suppose them to have been there satisfactorily disposed of.

It is next insisted that the Court erred in not requiring the

district-attorney to elect, at the commencement of the trial, under which count of the indictment he would proceed.

The indictment contained two counts. In the first the prisoner was charged with feloniously killing one Lucy A. McLaughlin; and in the second with feloniously killing one Kate Smith. After the jury was empanelled, the prisoner's counsel requested the Court to direct the district-attorney to elect on which count he would proceed. The Court thereupon stated that the motion would be reserved, and thereafter decided. No exception was taken at the time to this disposition of the motion, and the trial proceeded. The evidence showed that the deceased was known by the name of Kate Smith. She was generally, if not always, called by that name. One witness testified that she once told her that her name was Lucy Ann, and that she once wrote it on a box Lucy Ann McLaughlin. At the close of the evidence the Court alluded to the motion made at the opening of the case, and required the district-attorney then to elect under which count he would claim a conviction.

The district-attorney elected to hold the second count, in which the prisoner was charged with killing Kate Smith, and a nolle prosequi was thereupon entered by order of the Court to the first count. The counsel for the prisoner then moved that all the evidence referring to Lucy McLaughlin, or to the party under the name of Lucy McLaughlin, be stricken from the record, which motion was granted.

In all this the record discloses no error. Indeed there was no exception taken on which error could be predicated. The course adopted by the Court in reserving the decision seems to have been acquiesced in at the time; and when a ruling was made, it in all respects was as full and extensive as the prisoner's counsel desired.

It is true that, under the Act of 1855, the prisoner may have a new trial, even though no exception be interposed; but before he can claim the benefit of that act, it must be made to appear to the Court that the verdict was against the weight of evidence, or against law, or that justice requires a new trial. Here was no error of law, and the evidence of guilt is certainly overwhelming.

If every paragraph of the evidence in which the name of Lucy Ann McLaughlin occurs be stricken out, as it was in fact, there is proof abundant remaining to convict the prisoner of the murder of Kate Smith. Nor could the admission of the evidence which was afterward stricken out have operated to the injury of the prisoner. It did not tend to prove him guilty of any other or different offence than that of which he was convicted, for Lucy Ann McLaughlin was the same person called and known as Kate Smith, whose tragic death alone was the subject of examination. Most clearly the prisoner has no cause of complaint as regards this branch of the case.

It is urged that the letter produced and read on the trial was not sufficiently identified as the one sent to the deceased by the prisoner. This position is wholly unsupported by the facts. It was proved clearly that he wrote or originated it. A witness swore that he delivered a letter to the deceased, at his request, shortly before the fatal occurrence, and that she returned an answer. It was picked up in the house, and in or near her room, soon after, and being read in the prisoner's presence, he admitted its authenticity. More direct and satisfactory evidence of its identity can hardly be conceived.

No other subject remains for our examination. The defence relied on was insanity or moral irresponsibility. It was insisted on the trial that the prisoner was at the time laboring under an attack of delirium tremens. An unprofessional witness, a printer by trade, testified that he saw him about twelve or one o'clock of the day of the homicide ; that he had a wild vacant look about his eyes; was fidgety and uneasy ; spoke in a husky tone of voice. The counsel for the prisoner then proposed to prove him insane or delirious, by the opinion of the witness. One of the questions propounded was as follows : " Was he or not, in your opinion, insane or delirious ? " The question was excluded.

The Court remarked that the witness was at liberty to state the facts within his knowledge, but could not be permitted to give his opinion. The ruling of the Court was manifestly correct, according to numerous decisions, both in the Supreme Court and in this

Court.   It was laid down in Dewitt *v.* Barley (9 N. Y. 371), that "The opinions of witnesses, other than those who are specially qualified by scientific knowledge to judge of such matters, are not competent evidence of soundness or unsoundness of mind," except in cases of subscribing witnesses to wills or deeds.   (See also The People *v.* Lake, 12 N. Y. 358 ; and Clapp *v.* Fullerton, 34 N. Y.190.)

The true rule and line of distinction, as regards professional and non-professional witnesses, were laid down with clearness and precision by Porter, J., in Clapp *v.* Fullerton.   As there stated, a layman, when examined as to facts within his own knowledge bearing on the question of sanity, may be permitted to characterize the acts to which he testifies as rational or irrational.   He may testify to the impression produced by what he witnessed ; but he is not legally competent to express an opinion on the general question whether the mind of the individual be sound or unsound.   We adhere to the rule on this subject laid down in the case cited.

The Court was not in error in excluding the opinion of the witness on the subject of the prisoner's sanity or insanity.

Nor was there any error in the charge of the judge on submitting the case to the jury.   He defined the crime of murder correctly, as declared by the statute and by the common law; drew the attention of the jury to the leading and controlling facts of the case, and distinctly and intelligently instructed them on the subject of the meditated design.   In regard to the alleged defence of insanity, he stated that, to be effectual as a defence, it must be made to appear that the prisoner was, at the time of the homicide, laboring under such a defect of reason as to be unconscious of the nature, character, and consequence of his acts ; that voluntary intoxication was no excuse for crime ; but that actual insanity, even when brought on by long-continued, vicious or improper indulgence, would furnish immunity from punishment for acts which, under other circumstances, would be criminal.   This was sound law, just in its application to the conscious offender, yet recognizing the exemption due to those bereft of the power to discern between right and wrong (31 N. Y. 330, and cases there

cited). I am not so well satisfied with what occurred when the jury returned into Court for further instruction. A juror inquired as follows: " Is a person under delirium tremens of sound mind, in the meaning of the statute?" If the facts in proof were such as to make the inquiry material or essential to the decision of the case by the jury, they were entitled to a direct and explicit answer from the judge. This was not given. The jury were left without that clear and explicit instruction called for by the inquiry. The judge read to them the law applicable to a condition of drunkenness, in which a paragraph occurred bearing on the subject, in regard to which information was desired, and which, with some amplification, would have met the question. The paragraph was this—that if reason be perverted or destroyed by fixed disease, though brought on by a person's own vices, the law holds him not accountable. I think the question was not fully and clearly answered by this observation, which incidentally occurred where another subject was more directly under consideration. Had the facts proved made the question put by the juror apposite to the case, the Court should have answered that delirium tremens was actual insanity, and irresponsibility was the result, if the alleged offence was committed while the individual was deprived of reason by such settled or fixed disease.

But the case did not call for any instruction on the subject. There was no evidence of insanity or moral irresponsibility. There was no evidence that the prisoner was laboring under the disease known as delirium tremens. On the contrary, the evidence was unmistakable that the prisoner was governed by a responsible will and motive. Even if the statement of Dr. Shier be accepted, as proving the fact that about a week prior to the commission of the homicide the prisoner was suffering from an incipient attack of the delirium tremens, there is no evidence that it culminated to an extent producing insanity.

The evidence is clearly to the contrary. The letter he wrote or dictated, and sent to the deceased, immediately prior to the affray, evidences the existence of memory, reason, will, and purpose, and consequent moral and intellectual power and responsi-

bility. So also his remarks at the time of, and immediately succeeding the occurrence. No witness speaks of anything remarkable or unreasonable in his conversation or acts. Indeed, there is a total absence of all evidence showing that he committed the act under any delusion or condition of irresponsibility such as may be urged by way of exculpation.

On the contrary, it stands proved that, in the full exercise of his faculties, and governed by a wicked impulse which the law denounces and the good abhor, the prisoner deliberately sought out and slew his victim, in brutal disregard of her supplications and entreaties to be spared her life.

The question put by the juror had no pertinency to the case made by the evidence, and more precise and elaborate instructions on the subject of delirium tremens were needless.

After a careful examination of the case, we are of the opinion that the record discloses no error of law, nor is the evidence of guilt at all doubtful, or such its character or degree as to induce us to grant a new trial, on the ground that substantial justice demands it.

We must hold that the conviction of murder in the first degree was right, and that the judgment which the law directs in such case must be carried into effect.

Conviction affirmed.

<div style="text-align:right">

JOEL TIFFANY,<br>
State Reporter.