| 7 | 163 |
|---|---|
| 34 | 566 |

</div>

## J. W. WILLIAMS *v.* THE STATE.

1. **CHARGE OF THE COURT — INSANITY.** — In a trial for murder, the court below instructed the jury to the effect that an act done in a state of insanity is not punishable, and that in such cases the true inquiry is whether or not the accused was capable of having, and did have, a criminal intent, and the capacity to distinguish between right and wrong, in respect of the particular act of which he is charged. *Held*, in substantial accord with the adjudications of this and other States.

2. **NEWLY DISCOVERED EVIDENCE.** — Being found guilty of murder, the defendant filed his affidavit for a new trial, alleging that he had discovered since his trial that he could prove by certain absent witnesses that, a few hours before the homicide, they met the deceased, who was carrying a gun, and who inquired of them for defendant, saying that if he found defendant he would "make it warm for him," and would "set him up." *Held*, that the materiality of this proof is not apparent, inasmuch as it is neither alleged in the affidavit nor disclosed in the evidence at the trial that such threats of the deceased had been communicated to the defendant, or that the deceased, when shot by the defendant, was making any manner of hostile demonstration.

3. **SAME.** — Nor would newly discovered evidence to prove a criminal intimacy between the deceased and the wife of the defendant be material, without

further proof that such intimacy came to the defendant's knowledge, and that immediately thereupon he sought the deceased and killed him.

4. APPLICATION for new trial based on newly discovered evidence must allege that such evidence was unknown to the defendant at the time of the trial, and not merely that it was unknown to his counsel; and if the supporting affiants allege information derived from other persons, the names of such others should be disclosed, and their affidavits be either filed or the want of them accounted for.

5. PRACTICE IN COURT OF APPEALS. — This court cannot hold the refusal of a new trial to be error, when the motion therefor failed to comply with essential requirements of the law.

6. VERDICT. — The Code directs that verdicts shall be entered on the minutes of the court, but does not require the clerk to mark them "filed."

APPEAL from the District Court of Bastrop. Tried below before the Hon. L. W. MOORE.

The indictment charged that the appellant, on September 27, 1878, did, in the county of Bastrop, with malice aforethought, kill and murder one Frank Strickland by shooting him with a gun.

It appears by the evidence that Strickland lived with John Holligan in Bastrop County, and that about one o'clock on the day alleged in the indictment he was shot down and instantly killed by the defendant, at Holligan's gate and about ten steps from the door of the house. Holligan, his wife, and another witness were in the house, and, hearing the report of a gun, instantly looked out and saw the defendant, within ten feet of the deceased, take his gun from his shoulder and walk off, increasing his gait to a run at a little distance. The deceased was lying on the ground, dead, having received two buckshot in the head. No words were heard to pass between deceased and defendant. The deceased, when shot, was leading his horse from the horse-lot to the gate.

John Jenkins, for the State, testified that about noon on the day Strickland was killed the appellant came to witness's house and bought a double-barrelled shot-gun from witness, stating that he wanted it loaded. Appellant began

to load the gun, but seemed so awkward about it that witness loaded it himself. He asked the appellant what kind of shot he wished the gun loaded with; to which the appellant replied that he wanted it loaded with buckshot. Witness charged each barrel with twelve buckshot, and put caps on the tubes. In about half an hour the appellant left, taking the direction of John Holligan's house, which was about a mile distant.

The defence introduced Mary Jane Williams, the wife of the appellant. She stated that they had been married for about six months before Strickland was killed, and for about a month prior to that event they lived on Mr. Webber's premises. The deceased never visited their house more than three times; but the appellant, without cause, became jealous, and told witness there was something wrong between her and Strickland, and he did not want Strickland to visit there any more. On various occasions the appellant would imagine that he heard a noise on the outside of the house, and would jump up, get his gun, and run out. Witness would tell him there was nothing the matter, but he would insist that something was after him and trying to come about his house. At times he would seem to be friendly, and in a moment, without cause, would become enraged and seem perfectly frantic, and charge witness with infidelity with the deceased. On these occasions he exhibited the conduct of a madman. Witness could not under such circumstances continue to live with him, and on the morning of the day of the homicide she went over to the house of John Holligan, who was her uncle, and with whom the deceased was then living. Witness's father lived within a few hundred yards of her uncle's. She stated she could not like a man who had treated her as appellant had, and she retained no good feelings for him. She could not say that the appellant was insane; but thought he was not, and that he knew what he was doing.

Ed. Weaver, a witness for the defence, had known the

appellant well, prior to the homicide, and had often met him. Appellant's conversation was scattering and his language and ideas incoherent, and witness came to the conclusion that he was laboring under some mental disorder. Appellant's conduct and language always impressed witness with the belief that something was wrong with the appellant, and that his mind was in some way diseased. On cross-examination, however, the witness would not say that the appellant was incapable of judging between right and wrong. Witness believed that the appellant knew what was an offence, and that it was an offence to murder.

Frank Yoast, also for the defence, had known the appellant before the homicide, and from his manner and conversation believed that his mind was diseased. Two or three days after the homicide, the appellant came to where the witness then was, and said he wanted " to give up and go to town." Witness sent the appellant to his (the witness's) house to stay, and the next morning witness, on returning home, found him there. He asked witness to come to town with him. On their way to town the appellant hallooed and yelled at everybody he saw ; his conversation, manner, and conduct were not that of a sane man. But, on cross-examination, the witness thought the appellant knew right from wrong, and that it was wrong to kill a man.

Jesse Halcum, for the defence, stated that he and the appellant had worked together for a short period, some time before the homicide. Witness instanced singular acts and behavior of the appellant, and thought his conduct very strange. On cross-examination, the witness said that it had not occurred to him that the appellant's mind was affected.

The State, in rebuttal, introduced four witnesses whose opportunities had been good for observing the conduct and mental condition of the appellant for several months previous to the homicide. They concurred in pronouncing him a man of ordinary good sense, and had seen nothing to indicate an unsound condition of his mental faculties. For

four weeks immediately before the killing of Strickland, the appellant and his wife picked cotton for one of these witnesses, Mr. Webber, who testified that he had not observed any thing the matter with the appellant's mind. On the morning of the day of the homicide, witness moved the appellant's wife over to her uncle's; and on his return home, about ten in the forenoon, he had a settlement with the appellant, who had kept an exact account of the cotton picked by himself and his wife. The appellant and witness's son made the necessary calculations to ascertain the amount due appellant. Witness then paid appellant what was due him, and he left witness's place, which is somewhat between Jenkins's and John Holligan's, and about half a mile from the latter.

This concluded the evidence. All other matters appear in the opinion.

*R. C. Stafford,* for the appellant.

*Thomas Ball,* Assistant Attorney-General, and *W. B. Dunham,* for the State.

CLARK, J.   Appellant was convicted of the murder of one Frank Strickland, and his punishment assessed at death. On the trial of the cause there was evidence tending to show a disordered state of the mind on his part, before the killing, and the issue of his sanity at the time of the homicide was submitted to the jury in the charge of the court.

The charge upon this point was substantially to the effect that an act, otherwise criminal, done and performed in a state of insanity is not punishable; but the true inquiry should be whether or not the accused was capable of having, and did have, a criminal intent. If he had such intent, he was punishable, otherwise not, — the true test being the capacity to distinguish between right and wrong as to the

particular act with which he is charged. We deem this instruction in substantial accord with established precedents, both in our own and other States. *Webb* v. *The State*, 5 Texas Ct. App. 607, and authorities there cited.

After his conviction, appellant moved for a new trial, basing his application, among other grounds, upon alleged newly discovered evidence. His own affidavit was appended to and in support of the motion, in which it is averred that since the trial of the case he has been informed that he could prove by two parties, whose names are given, who resided near the scene of the homicide, but both of whom were temporarily absent from the county, that on the day of and some hours before the difficulty they met the deceased, armed with a double-barrelled gun, who inquired of them for appellant, and stated that if he found him " he [deceased] would make it warm for him ; " that appellant had been in his way for some time, and that he (deceased) had succeeded in parting appellant and his wife, and " that he intended to set him up."

Appended to the motion appears also an affidavit of appellant's counsel to the effect that the affiant was acquainted with the absent witnesses, and that their whereabouts is not known, and it was impracticable to obtain their affidavits in support of the motion. This affidavit further states that since the trial of the cause the affiant was informed that one Weaver, who testified for appellant on the trial, had stated after the trial that he knew facts that, if testified to, would have secured appellant's acquittal ; that he (witness) had witnessed improper intimacies between the deceased and the wife of appellant, at the house of witness, anterior to the killing ; and that this was not known to the affiant until since the trial.

If proper diligence had been shown in the supporting affidavits, which we think was not done, they are wholly insufficient in that the names of the informants were not furnished to the court, nor are their affidavits produced or

accounted for in any manner.   In view of the evidence ad-
duced upon the trial, we fail to perceive the materiality of
the testimony.   This evidence shows a deliberate prepara-
tion on the part of appellant to take the life of the deceased,
which was executed with equal deliberation and coolness.
There is nothing in the record tending to show communi-
cation of these threats, or that the appellant acted upon
them ; nor does any thing appear in the motion for new trial
showing an ability or even a disposition to supply this evi-
dence.   No act seems to have been done or attempted by
the deceased, at the time of the homicide, manifesting an
intention to carry a previous threat, if such was made, into
execution ; nor does it appear that the deceased did any
act, at the time of the killing, which could show any hostile
intention whatsoever toward appellant.

The affidavit of appellant's attorney fails to negative the
fact that appellant was informed of what the witness
Weaver could testify, before the trial ; and the facts stated
in said affidavit, when viewed in the light of the testimony,
are believed to be alike immaterial.   If improper intimacy
existed between the deceased and appellant's wife, it does
not appear that such intimacy was discovered by appellant,
or that, immediately upon such discovery, appellant sought
out the invader of his home and slew him.   Under our
provisions of law this was requisite to reduce the homicide
below the grade of murder.   Pasc. Dig., art. 2254; *San-
chez* v. *The People*, 22 N. Y. 147.   Indeed, there is no evi-
dence before us which tends to show the existence of any
such relation, but only a suspicion upon the part of appel-
lant to that effect, long entertained ; but whether well
founded or baseless, we cannot say from the record before
us.

The motion for new trial failing to comply in essential
particulars with the requisites of the law, this court cannot
say that the court below erred in refusing a new trial.
*Yanez* v. *The State*, 6 Texas Ct. App. 429 ; *Polser* v. *The*

*State*, 6 Texas Ct. App. 510 ; *Evans* v. *The State*, 6 Texas Ct. App. 513 ; *Tuttle* v. *The State*, 6 Texas Ct. App. 556 ; *Hasselmeyer* v. *The State*, 6 Texas Ct. App. 21 ; *Tooney* v. *The State*, 5 Texas Ct. App. 163 ; *Templeton* v. *The State*, 5 Texas Ct. App. 398.

It is complained that the verdict, after its return by the jury, was not marked " filed " by the clerk, as required by law. We know of no provision of law that requires this to be done, nor has any such provision been pointed out to us by counsel. The statute only requires that it be entered upon the minutes of the court, which was done in this case. Pasc. Dig., art. 3088.

This case has received at our hands the most careful consideration and scrutiny, not alone because the life of a fellow-being was involved in the issue, but because appellant claims to have been surrounded by circumstances at the time of the homicide which appeal most strongly to the sympathies of every English-speaking person. Whatever may have been the provocation of appellant, the duty of this court in passing upon any criminal case is confined to the questions of law and fact apparent upon the record sent up to us. The law has wisely vested a wide discretion in the judges who preside at trials, and who become personally cognizant of many phases in the course of the trial which cannot appear to this court upon the pages of a record. An abuse of this discretion, if made to appear to this court, is susceptible of revision here ; but in the absence of such showing, our duty is so plainly marked out that we cannot avoid it if we would.

Looking to the record, we fail to perceive any error of the court throughout the progress of the trial. The appellant was defended by counsel, and before a jury of his own selection. The prosecution was based upon an indictment sufficient in all legal requisites. The charge of the court distinctly sets forth the law applicable to the case, and the verdict is fully supported by the testimony. No error is

made to appear in any of the rulings on the trial, and the conviction is in all respects valid. We have no alternative, therefore, but to affirm the judgment, which is accordingly done.

*Affirmed.*