COMMONWEALTH *vs.* WILLIAM COY.

Berkshire.    September 13, 1892. — October 20, 1892.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Homicide — Indictment — Variance — Trial.*

An indictment alleging the murder of a person by striking him with an axe, in one count, on the left temple bone of the head, and, in another count, on the left side of the head near the ear, each wound being of certain dimensions, is supported by proof of a wound in the throat, as well as one on the head, produced by a blow from the same axe, which might have caused the death although the wound on the head was mortal.

It is no objection to an indictment, alleging in one count the murder of a person by striking him on the head with an axe, and in another count "in some way and manner, and by some means, instruments, and weapons to the jurors unknown," that the evidence discloses wounds in the throat and on the head of the deceased inflicted by the same axe, either of which might have caused the death, if it does not appear what evidence was before the grand jury.

An indictment in three counts alleged in two counts the murder of a person by striking him on the head with an axe, and in the third count "in some way and

manner, and by some means, instruments, and weapons, to the jurors aforesaid unknown." At the trial, the evidence disclosed wounds in the throat and on the head of the deceased inflicted by the same axe, either of which might have caused the death; and it did not appear what evidence was before the grand jury. The court instructed the jury, in substance, that it was the duty of the grand jury to describe the means of death with as much particularity as they were able to; that if they found that the grand jury knew that the death was caused by some means which they had not set forth, although they might have done so, that would constitute a fatal variance between the evidence and the third count; that it was not evidence that the grand jury knew the cause of death because the circumstances revealed that, if they had made further inquiry and investi- · gation, they might have known; that the declaration of the grand jury that they did not know the cause of death was to be taken as true, unless there was evidence to show the contrary; that the burden was still on the government to make out its averments by satisfactory proof; and that if they found that the grand jury did know the cause of death, and that the statement in the third count that they did not know was unfounded, and had been shown to be so, or was not proved to be true, they could not convict the defendant on the third count; and further said: "You will understand by the observation that the statement of the grand jury that they did not know the cause of death, or that the death was caused in ways and by means unknown to them, is to be taken into account not strictly or technically as evidence, but is to be taken in connection with any evidence on that subject before you, to determine the question as to whether the grand jury did or did not know the cause of the death." *Held*, that the defendant had no ground of exception.

At the trial of an indictment for murder, the defendant testified that the deceased attacked him, and he killed him in self-defence; and that the deceased admitted to him, on the day of the murder, that he had had sexual intercourse with the defendant's wife. Before the charge to the jury, the defendant, upon being informed that he might address the jury, said to them: "Well, gentlemen, I have told the truth. This trouble was caused by his being with my wife." The judge, in charging the jury upon the question of self-defence, said: "Here, again, this question is to be determined by you upon the evidence. What has the defendant said about this at other times? What did he say about it on the stand as a witness? · What did he say to you this morning was the reason why he struck the man down? Was it because he had been attacked, and the attack was being followed up, and he was being pursued by his assailant, or was it from some other cause?" Upon the defendant's counsel objecting to the judge's comment on the defendant's remarks to the jury, the judge, after calling the jury's attention to such comment, said to them: "I now withdraw that observation entirely, and ask you to pay no heed to it, nor take that into account in any manner as any part of the evidence"; and, in accordance with the request of the defendant's counsel, "The jury heard what the prisoner said, and they will give it such weight as they think it is entitled to; not as evidence, but as an observation, a speech." *Held*, that the defendant had no ground of exception.

After sentence for murder the defendant filed with the Superior Court a motion for a new trial, which was overruled, and he then petitioned this court for a writ of error, claiming that the action of the Superior Court was erroneous. The petition did not show that the justices of the Superior Court who heard the motion, being the same justices who presided at the trial, in overruling the motion, made any ruling upon any question of law. There was nothing to show what they found the facts to be with reference to the allegations contained in

the motion. *Held*, that, as upon the evidence exhibited before the justices they in their discretion refused a new trial, this court would not revise the exercise of that discretion on a writ of error.

INDICTMENT, in three counts, for murder. The indictment was as follows:

"The jurors for said Commonwealth on their oath present that William Coy of Westfield, in the county of Hampden in said Commonwealth, on the thirtieth day of August in the year of our Lord one thousand eight hundred and ninety-one, at Washington, in the county of Berkshire, with force and arms in and upon one John Whalen feloniously, wilfully, and of his malice aforethought did make an assault, and that he the said William Coy then and there with a certain axe which he the said ·William Coy in both his hands then and there had and held, him the said John Whalen in and upon the head of him the said Whalen on the left temple bone thereof upon the left side of said head then and there at Washington aforesaid feloniously, wilfully, and of his malice aforethought did strike, giving unto him the said Whalen then and there with the axe aforesaid by the stroke aforesaid in the manner aforesaid in and upon the head of him the said Whalen on the left temple bone of his said head upon the left side of his said head one mortal wound of the length of four inches, of the breadth of one inch, and of the depth of one half-inch, of which said mortal wound the said Whalen then and there instantly died, and so the jurors aforesaid upon their oath aforesaid do say and present that the said William Coy him the said John Whalen in manner and form aforesaid then and there at Washington aforesaid feloniously, wilfully, and of.his malice aforethought did kill and murder, against the peace and dignity of the said Commonwealth and contrary to the form of the statute in such case made and provided.

"And the jurors aforesaid, upon their oath aforesaid, do further present that William Coy of Westfield aforesaid, on the thirtieth day of August in the year of our Lord one thousand eight hundred and ninety-one, at Washington aforesaid in the county of Berkshire aforesaid, with force and arms in and upon one John Whalen feloniously, wilfully, and of his malice aforethought did make an assault, and that he the said William Coy then and

there with a certain axe which he the said William Coy in his hands then and there had and held, him the said John Whalen in and upon the head of him the said John Whalen, on the left side of the head of him the said John Whalen in front of the ear, and near to the left ear of his the said John Whalen's said head, then and there feloniously, wilfully, and of his malice aforethought did strike, giving unto him the said John Whalen then and there at Washington aforesaid in the county of Berkshire aforesaid, with the axe aforesaid, by the stroke aforesaid, in the manner aforesaid, in and upon the head of him the said John Whalen on the left side of his said head in front of and near the left ear of his the said John Whalen's said head, one mortal wound of the length of four inches, of the breadth of one inch, and of the depth of one half-inch, of which said mortal wound the said John Whalen then and there instantly died; and so the jurors aforesaid, upon their oath aforesaid, do say and present that the said William Coy him the said John Whalen in manner and form aforesaid then and there at Washington aforesaid feloniously, wilfully, and of his malice aforethought did kill and murder, against the peace of said Commonwealth and contrary to the form of the statute in such case made and provided.

"And the jurors aforesaid, upon their oath aforesaid, do further present that the said William Coy, at Washington aforesaid, in the county of Berkshire aforesaid, on the thirtieth day of August now last past, in and upon the said John Whalen feloniously, wilfully, and of his malice aforethought did make an assault, and him the said John Whalen, in some way and manner, and by some means, instruments, and weapons, to the jurors aforesaid unknown, did then and there feloniously, wilfully, and of his malice aforethought, deprive of life, so that he the said John Whalen then and there died; and so the jurors aforesaid, upon their oath aforesaid, do say, that the said William Coy him the said John Whalen in manner and by the means aforesaid to them the said jurors unknown then and there feloniously, wilfully, and of his malice aforethought did kill and murder, against the peace and dignity of the Commonwealth aforesaid and contrary to the form of the statute in such case made and provided."

Trial in the Superior Court, before *Mason*, C. J., and *Aldrich* and *Hammond*, JJ., who allowed a bill of exceptions, in substance as follows.

The evidence for the government showed that Whalen was last seen alive by any person except the defendant about eight o'clock in the evening of August 29, 1891, near the railroad station at Washington, walking toward the house of the defendant, with whom he had been boarding for some months prior to the homicide. His body was found buried in the woods, about thirty rods from the dwelling of the defendant, on October 13, 1891. A post-mortem examination of the body, made by the medical examiner, Dr. Frank K. Paddock, immediately after the body was found, showed that the skull had been broken in, substantially as described in the first two counts of the indictment; that a piece of the skull two and three fourths inches in length and about one inch in width had been broken out, and driven in upon the brain; that this piece of the skull was wholly disconnected with the balance of the skull, almost as if it had been sawed out, so that the medical examiner removed it with his fingers; that the throat of the deceased was cut so as nearly to sever the head from the body; that both legs of the deceased were cut off nearly up to the body; and that the body was substantially emptied of blood. There was no evidence of other injuries or marks of violence upon the body, and it was identified by a witness who had known the deceased in his lifetime.

There was also evidence tending to show the following facts. The defendant was seen near the station at Washington, at about midnight on said August 29, which was Saturday. About two hours afterward he called at the station, and inquired of the night switchman if he had seen Whalen, saying that he had been looking all night for him. Before six o'clock on the morning of August 30, 1891, the defendant called upon one Eliza A. Geer, who lived a few rods from his house, and asked her if she had seen Whalen, saying that he could not find him. The defendant went from the house of Mrs. Geer to the house of one Kelly, and remained with Kelly during most of the day. The government contended that the defendant had killed Whalen between midnight on said August 29 and the time when he called at Mrs. Geer's, and had buried the body in the

woods where it was found. The government called as a witness one Moses H. Pease, a member of the State police force, who testified to conversations with the defendant, in which conversations the defendant had, up to the time of the finding of Whalen's body, denied that he had killed Whalen; but that after the finding of the body he admitted that he had killed him, and had told witness how he killed him. This witness also produced a written statement, which the witness in his testimony called a confession, and which he testified he had written out for the defendant at his request in the presence of John Crosby, sheriff of Berkshire County; that he was sent for by Crosby, and went to the jail, where he was told by Crosby, in the presence of the defendant, and by the defendant himself, that he wanted to make a confession; that no threats, inducements, or promises were made to the defendant; that the witness wrote down what the defendant said substantially as he told it; that after he had written it, he read it over to the defendant and asked him if there was anything he wanted to change or add to it; that the defendant said there was not; and that the defendant then signed it in the presence of the witness and Crosby, both of whom signed it as witnesses. The evidence of Pease was corroborated by Crosby. The defendant objected to the admission of this statement, on the ground that it was not the language and the ideas of the defendant, but the court admitted it; and the defendant excepted.

Pease also testified that the defendant, at a subsequent time, told him that he cut Whalen's throat about an hour after he knocked him down, and that he cut his throat to make sure he was dead.

Crosby also testified that the defendant told him that he hit Whalen with the axe and knocked him over, and in about an hour or so struck him in the neck with the axe; that he did not bleed much when he cut his throat; that he had got through bleeding, — bled as much from the head as anywhere; that soon after he cut Whalen's throat with the axe he dragged his body into the yard, and cut off his legs; and that the body was pretty stiff and cold then.

The government introduced evidence tending to show that Whalen must have been lying down when he received the blow

which fractured his skull; and that the defendant robbed Whalen, and robbery was the motive of the murder.

Several medical experts testified for the government, in substance, that, while the wound on Whalen's head was mortal, it would not be likely to cause death instantly; that the blood which would flow from it would not be a very large proportion of the whole amount in the body; that the blood would not flow after death; and that a cut in the throat severing the principal veins and arteries there would cause death by bleeding very quickly.

Dr. Paddock admitted that he testified before the grand jury, but it did not appear what his testimony was there; and the witness Pease testified that he did not recall what testimony he gave before the grand jury, only in a general way, but that he thought it was substantially the same as given at the trial; and Crosby testified that he believed all that was inquired of him before the grand jury was that he was present and heard the defendant's statement made, and witnessed it. Other than this, it did not appear what the evidence was before the grand jury.

The defendant testified, in his own behalf, that he reached home soon after midnight on the night of August 29, 1891, and, as Whalen was boarding with him, he expected to find him there; that not finding him, and knowing that he was intoxicated in the evening, he went out with his lantern to find him; that he went to the depot and inquired for him, and looked in various places where he thought he might have gone to lie down for a drunken sleep; that, not finding him, he again went home; that it was then about two o'clock in the morning; that his wife was not at home, having left on the Friday before to go to Three Rivers, as she said, but Whalen having told him the afternoon before that she was at Albany and had planned to run away with him, he began to search Whalen's trunk to see if her clothing was in it; that while he was looking through the trunk Whalen came in much intoxicated, and struck him with his fist and knocked him down, and then attacked him with an axe; that he clinched hold of the axe, a struggle followed, and in the scuffle he got the axe away from Whalen, and struck him " first one way and then the other " with the axe, and the deceased fell on the floor; that he lifted him up and put him on the bed,

found that he had cut his throat " considerably " with one blow
of the axe, and that there was a " bruise " on his head ; that the
deceased lay on the bed for about an hour and a half, when the
defendant, becoming satisfied that he was dead, and being afraid
to go and confess what had happened, dragged the body out
doors, and, as he found he could not carry it entire, cut off the
legs close to the body with an axe or saw, he did n't know which,
as he had both; that he then carried the body up into the
woods, and came back and got the legs and carried them up ; that
he covered the body and legs with some leaves and sticks, and
left them there until the morning of the following Wednesday,
when he went up with a shovel and axe, dug a hole, and put the
body in; that he found the hole was not large enough, so he
took the axe and cut the neck so that he could double the head
back under the body ; that he threw the legs on the body, and
hastily covered all with dirt ; that he and Whalen had been good
friends until he noticed improper attentions of Whalen to his
wife; that on said Saturday, when on the train between Pitts-
field and Washington, Whalen told him that his wife was in
Albany ; and that " he had been with her and liked her and was
going to have her, and had paid her to run away with him."
The defendant contended, and it was not disputed, that the
defendant meant by the words " had been with her," that he
had had sexual intercourse with her.  The defendant introduced
other evidence, tending, as he argued, to corroborate his state-
ment as to the criminal intimacy of Whalen with his wife, and the
government introduced other evidence tending, as it contended, to
meet this evidence, and to show that robbery, and not Whalen's
relation to the defendant's wife, was the motive of the homicide,
including evidence that the defendant said, before Whalen's
body was found and before the arrest, that he never had any
suspicion of anything wrong between Whalen and his wife; and
that after he was arrested he said, among other things, that
Whalen had given him $100 on the train Saturday in consid-
eration of his previous relations with Mrs. Coy, and said that
he would have no more to do with her.

The defendant asked the court to instruct the jury as follows :
" 1. The defendant cannot be legally convicted on the evidence
in this case on either or any of the three counts in this indict-

ment. 2. If the jury find that the deceased died from the effects of the wound in the throat, or are left in doubt as to whether he died from the effects of that or the wound in the skull, then the jury cannot legally convict the defendant on either the first or second count of said indictment, whether the grand jury did or did not know of the wound in the throat. 3. The defendant cannot be convicted on the third count in this indictment, under the evidence in this case. 4. The defendant cannot be convicted under the third count in this indictment, if the grand jury knew of the cause of death, or of several things either one of which caused the death. 5. The defendant cannot be convicted under the third count in this indictment, if the jury find that the deceased came to his death from a cause or any one of several causes known to the grand jury. 6. The law requires the grand jury to describe the manner and means of death with as much certainty as the circumstances of the case will permit, and they cannot charge that it was from a cause unknown, if the jury find that they did know the cause, or that it was one or the other of two causes. 7. If the jury find that the deceased came to his death either from the wound in the head or the wound in the throat, and that the grand jury knew of each of these wounds, then the jury cannot convict the defendant on the third count, though they find that the grand jury did not know which of the two wounds caused the death. This would also be so if the jury find that the death was the joint result of both causes combined."

The court declined to give these instructions, and upon the subjects of the requests instructed the jury in substance as follows :

" The allegations must not only be properly made, but they must be proved. The two must agree. If the wound described in the indictment be a fractured skull, that would not be supported by proof of an incised wound in the neck. There would be a material variance between the allegation and the proof. It is not material that the wound should be proved to be of the exact length, width, or depth described, but the proofs must correspond substantially with the averments, and proof that the death was caused by an incised wound in the throat will not support the averment that it was caused by a fracture of the skull. . . . But it will not be sufficient to establish a fatal vari-

ance to show that the wound in the throat was given before the death, and that it was a contributory cause to the death. . . . For if the defendant gave to John Whalen a mortal wound as set forth in the first and second counts, and after the interval of an hour or an hour and a half gave to Whalen another mortal wound, and Whalen then and there died, and the jury find upon the evidence that the first wound co-operating with the second wound contributed to and hastened the death of Whalen, they would be authorized to convict the defendant upon the first and second counts, provided the indictment is supported in other respects. . . . The same will be true in view of a declaration made by the prisoner as a witness upon the stand, as to the manner in which he inflicted the wounds, which you heard; according to his statement here, the cut in the throat was inflicted, if not simultaneously, in quick succession after the blow upon the head. Should the jury find that the wound upon the head and the wound in the neck were given in quick succession, as I understand was testified to by the prisoner, — you will remember whether that testimony was given, — if this was the order and sequence of these two wounds, and the jury find that the wound on the head contributed with the wound in the neck to cause and to hasten the death, then they would be authorized to find the defendant guilty upon the first and second counts. It does not depend upon the chronological succession of the acts. . . .

" As to the third count, I have said this is an authorized method of pleading, charging the death to have occurred in a way and manner and by instrumentalities unknown to the grand jury. It has been urged as an objection to this indictment, that the grand jury say in the first two counts that the death was caused with an axe inflicting a blow upon the head, and then have declared that the death was caused by means and instruments unknown to them; and that this presents such an inconsistency in the method of pleading as to show that the evidence cannot support the first two counts in this indictment. . . . There is no impropriety of pleading for the grand jury to report in the first instance, as they have done in the first two counts, that the death was caused by means specifically described, and then to charge in another count that the death was caused by means unknown to them. . . . No man knows, except the defendant, exactly how

this death was caused, or in what order these wounds were given. When the body was found and examined by other witnesses it was found with the head nearly severed from the body turned under the body, both legs were found cut off above the knees, and this wound was found upon the head. Upon such a state of things, upon such a condition of the body, the grand jury might well have found that the death was caused in a way and by means to them unknown. To be sure they had evidence, and the evidence apparently of what the defendant had said about it; but that was evidence, and it was for the grand jury, as it is for you, to say how much credence they would attach to the statement of the defendant, which in that case was a statement not made under oath, and was reported to them by a party to whom the statement was made. How much or how little of that evidence commended itself to the judgment and credence of the grand jury we do not know. . . . It was the duty of the grand jury to describe the fatal wounds and the means of death with as much particularity and exactness as they were able to. And if you should find that the grand jury knew that the death was caused by some means which they have not set forth, although they might have done so, that would constitute a fatal variance between the evidence and the third count, for the proofs must correspond with the averments of the indictments. . . . You must discriminate between what the grand jury might have known by the exercise of more diligence, and what they actually knew. It is not to be determined at once, by proving that certain evidence was offered to the grand jury, that they therefore knew what the evidence tended to prove. It is not evidence that the grand jury knew the cause of death because the circumstances reveal that, if they had made further inquiry and investigation and a longer inquisition, they might have known. . . . The grand jury have said under oath in this third count that they did not know the cause of this death, and that declaration of the grand jury is to be taken as true, unless there is evidence in the case to show that it is not true. . . . The burden here is still upon the government to make out its averments by satisfactory proof. . . . If you find that the grand jury did know the cause of death, and that this statement in the third count that they did not know is unfounded has been shown to be so, or is not proved to be true, then you cannot convict the defendant on this third count.

. . . You will understand by the observation that the statement of the grand jury that they did not know the cause of death, or that the death was caused in ways and by means unknown to them, is to be taken into account not strictly or technically as evidence, but is to be taken in connection with any evidence on that subject before you, to determine the question as to whether the grand jury did or did not know the cause of the death of Whalen."

To this the defendant excepted.

In regard to the defendant's second request for instructions, the court said: " I have declined to give the instruction in the words of the prayer, but I desire in that respect to repeat the observation that the proofs must correspond with the allegations in the indictment, and, in order to find that the wound upon the head was the cause of death, you must find it proved to be the cause of death, acting as a sole and only cause. . . . Before you can find the defendant guilty of giving the wound upon the skull, you must find, either that that alone caused the death, or that it contributed with the other cause, to wit, the cut in the throat, to hasten the death ; but, as an independent cause of death, you cannot convict him of the wound on the head, unless you find that that was what killed him, as an independent cause. But you will be authorized to convict, if that contributed to and hastened the death connected with the cut in the throat."

After the arguments and before the charge, the defendant was informed by the court that he might address the jury in his own behalf. He then said to the jury: " Well, gentlemen, I have told the truth. This trouble was caused by his being with my wife." The court, in charging the jury upon the question of self-defence, said: " Here, again, this question is to be determined by you upon the evidence. What has the defendant said about this at other times? What did he say about it on the stand as a witness? What did he say to you this morning was the reason why he struck the man down? Was it because he had been attacked, and the attack was being followed up, and he was being pursued by his assailant, or was it from some other cause?"

At the close of the charge, the counsel for the defendant called the attention of the court to various subjects of exception, and among other things this was said:

"*Mr. Joyner.* We desire to except to what the court said with reference to the remark of the prisoner made to the jury this morning, it not being in evidence. The remark of the prisoner, as we say, was not evidence, and not open to comment by the court, and we wish an exception to the refusal of the court to give our requests as far as they were not given.

"*Aldrich, J.* I wish you would ask each one of those separately. In regard to that other matter, I will withdraw the observation.

"*Mr. Pillsbury.* The allusion to what the prisoner said this morning?

"*Aldrich, J.* Yes. (*To the jury.*) Gentlemen, it is thought that some undue weight may be given to one statement made by the court in regard to what the prisoner said this morning when asked if he desired to say anything. I said to you, 'You heard what he said this morning.' I now withdraw that observation entirely, and ask you to pay no heed to it, nor take that into account in any manner as any part of the evidence.

"*Mr. Parkhurst.* We mean what your honor said about it.

"*Aldrich, J.* Yes, what I said about it.

"*Mr. Parkhurst.* But not the remark itself.

"*Aldrich, J.* Yes, what I said about it is withdrawn absolutely, and you will pay no heed to it whatever.

"*Mr. Pillsbury.* I suppose your honor also intends to have the jury understand that what the prisoner said this morning is not evidence in the case.

"*Aldrich, J.* No, sir; that is the very objection that they make. It is not to be treated as evidence.

"*Mr. Joyner.* Your honor says it is not evidence, but my associate suggests it is something the jury have a right to consider. I suppose that is so, because otherwise he would not be permitted to make it.

"*Aldrich, J.* Certainly, it is part of the address to the jury.

"*Mr. Parkhurst.* Will the court state to the jury that, while what he said was not evidence, still they have a right to consider it if they choose?

"*Aldrich, J.* The jury heard what the prisoner said, and they will give it such weight as they think it is entitled to; not as evidence, but as an observation, a speech."

No exception was saved, except as above stated, and nothing further said on the subject.

The jury returned a verdict of guilty of murder in the first degree; and the defendant alleged exceptions.

*H. C. Joyner*, (*C. J. Parkhurst* with him,) for the defendant.

*A. E. Pillsbury*, Attorney General, for the Commonwealth.

KNOWLTON, J. The exception to the admission of the defendant's confession because it was reduced to writing by another before it was read to the defendant and signed by him, was waived. By adopting the language, the defendant made it his own. *Commonwealth* v. *Hildreth*, 11 Gray, 327.

The next exception is founded on the refusal of the court to give to the jury certain instructions requested by the defendant. These all relate to the evidence in regard to the cause of death of the deceased person, as applied to the allegations of the indictment in that particular. There was evidence that the body when found showed a mortal wound upon the skull, apparently made by a blow with an axe or some similar instrument, the head was nearly severed from the body and bent back under the body, the body was substantially emptied of blood, and both legs were cut off. There was evidence that the defendant said that he knocked the deceased down with an axe, and cut his throat about an hour afterwards to make sure that he was dead, and that he subsequently cut off his legs. According to the testimony, he also said that the deceased " did not bleed much when he cut his throat; that he had got through bleeding, bled as much from the head as anywhere." At the trial the defendant testified, that he struck the deceased " first one way and then the other with the axe, and the deceased fell on the floor; that he lifted him up and put him on the bed, found that he had cut his throat considerably with one blow of the axe, and that there was a bruise on his head "; and that after he was dead he cut off the legs close to the body, and when he was about to bury the body he cut the neck with the axe so that he could bend the head back under the body. There was evidence from medical experts that, while the wound on the head was mortal, it would not be likely to cause death instantly, and that the blood which would flow from it would not be a very large proportion of the whole amount in the body, and that the blood would not

flow after death.   It was also testified that a cut in the throat, severing the principal veins and arteries there, would cause death by bleeding very quickly.

The exception taken was to the refusal of the court to give in terms the instructions requested, and not to the instructions given.   So far as the requests relate to the first and second counts of the indictment, the instructions given were sufficiently favorable to the defendant.   Each of the first two counts alleges that the death was caused by a wound on the head produced by a blow with an axe.   If the wound in the throat caused the death, the defendant's testimony tended to show that it was produced by a blow from the same axe, inflicted at the same time.   There is nothing to show that its size and shape differed much from the description in the indictment.   This was not a variance.   It is not necessary that allegations of this kind should be proved with literal accuracy.   It is enough if the death is shown to have been caused in a manner or by means of the same general character as those charged. The fact that the wound which caused death was in the throat instead of on the temple, if the jury so found, or that its size and shape were not exactly as alleged, is immaterial.   It is not as if the proof showed a death by drowning, when the charge was of a death by shooting.   The authorities well warrant a conviction under the first or second counts on facts which the jury may have found in this case.   *Commonwealth* v. *Woodward*, 102 Mass. 155.   *Commonwealth* v. *McAfee*, 108 Mass. 458. *Sanchez* v. *People*, 22 N. Y. 147.   *Real* v. *People*, 42 N. Y. 270. *Bryan* v. *State*, 19 Fla. 864.   *Rodgers* v. *State*, 50 Ala. 102.   *State* v. *Fox*, 1 Dutcher, 566.   *State* v. *Hoyt*, 13 Minn. 132.   *State* v. *Lautenschlager*, 22 Minn. 514.   *State* v. *Gould*, 90 N. C. 658.

In regard to the requests which refer to the third count, the jury were correctly instructed.   Under the twelfth article of the Declaration of Rights of the Constitution of Massachusetts, " No subject shall be held to answer for any crimes or offence until the same is fully and plainly, substantially and formally, described to him."   Under this provision, as well as under the rules of the common law, it is the duty of a grand jury in framing an indictment to state their charge with as much certainty as the circumstances of the case will permit.   But an indictment is

merely the charge or accusation of the grand jury, and if the evidence before them points clearly to the commission of a murder by the prisoner in one or two or three modes, but leaves it doubtful in which, it is proper for them to present different counts in their indictment stating the cause of death in different ways, so that the averment may accord with the facts as they finally appear at the trial; and if, upon the evidence before them, they are in doubt as to what was the cause of death, they may properly frame a count alleging that the death was caused in some manner to them unknown. *Commonwealth* v. *Webster,* 5 Cush. 295.

The defendant's proposition, embodied in his requests for instructions, is, in substance, that such a count cannot be availed of to cover a cause of death of which there is any evidence before the grand jury, and that every cause of which there is any suggestion in the evidence must be specially alleged in the indictment, or it will not support the indictment if proved at the trial. The authorities do not sustain this contention. Where the whole evidence goes far enough to produce in the minds of the grand jury such a conviction in regard to the mode of death as may fairly be called knowledge such that ordinary men would be willing to act upon it as true, they are bound to allege the cause particularly in the indictment; but if not, although it is proper to charge specifically in one or more counts such facts in the description of the offence as seem probable on the evidence, they may charge that the death was by means to them unknown. *Commonwealth* v. *Hill,* 11 Cush. 137, 141. *Commonwealth* v. *Sawtelle,* 11 Cush. 142. *Commonwealth* v. *Martin,* 125 Mass. 394. It has also been repeatedly decided in this Commonwealth, that if the grand jury might, by the exercise of reasonable diligence, have ascertained the facts alleged to be unknown, that does not preclude them from making their allegation in this form, nor create a variance under such an allegation. *Commonwealth* v. *Stoddard,* 9 Allen, 280. *Commonwealth* v. *Sherman,* 13 Allen, 248. *Commonwealth* v. *Pratt,* 145 Mass. 248.

The defendant excepted to the following instruction: " You will understand by the observation that the statement of the grand jury that they did not know the cause of death, or that the death was caused in ways and by means unknown to them,

is to be taken into account not strictly or technically as evidence, but is to be taken in connection with any evidence on that subject before you, to determine the question as to whether the grand jury did or did not know the cause of the death of Whalen." This instruction is to be considered in connection with other instructions in reference to the same subject. In reference to this allegation in the third count, the judge said: " The burden here is still upon the government to make out its averments by satisfactory proof. . . . If you find that the grand jury did know the cause of death, and that this statement in the third count that they did not know is unfounded has been shown to be so, or is not proved to be true, then you cannot convict the defendant on this third count."

An allegation that a death was by means to the grand jury unknown may be divided into two parts. So far as it is strictly a description of the offence it is merely an averment that the death was by means not stated; besides that, it gives a reason for not making a more specific charge in this particular, namely, that the grand jury are ignorant in regard to it. This part of the allegation is in no proper sense a description of the offence. It relates to the form of the indictment, and is made solely as a justification of the count which fails to state what ordinarily should be stated. It is a recital of a fact, which, if true, shows that the indictment is in proper form. It has been decided that under a count of this kind, in the absence of evidence tending to show knowledge on the part of the grand jury, the Commonwealth need not prove affirmatively that they were ignorant of that which is alleged to be unknown. *Commonwealth* v. *Thornton*, 14 Gray, 41. *Commonwealth* v. *Glover*, 111 Mass. 395, 401. In such a case the maxim *Omnia rite acta præsumuntur* may well be held applicable. *Berlin* v. *Bolton*, 10 Met. 115, 120. *Griffin* v. *Rising*, 11 Met. 339, 347. *Flagg* v. *Worcester*, 8 Cush. 69, 72. The existence of facts which relate only to the form and not to the substance of proceedings taken by a public officer, or by a legal tribunal, need not be proved in the first instance if they are recited, and if the action taken appears upon the recital to be regular and proper. Thus it will be assumed until the contrary appears that a special justice of a police or district court, who has authority to receive complaints and issue warrants when the

court is not in session, is acting within his authority when he issues and signs a warrant as special justice. *Commonwealth* v. *Lynn*, 154 Mass. 405, and cases cited. If a record of a police court recites facts which authorize a special justice to hold the court, it is not necessary to prove these facts in the first instance, but there is a presumption that his action was regular, and that the facts recited which show proper action are true. *Commonwealth* v. *Fay*, 126 Mass. 235. *Commonwealth* v. *Fay*, 151 Mass. 380. On the facts stated in this indictment, the action of the grand jury in presenting the third count was regular, and on their recital of a fact which bore only on their right to proceed in that way there was a presumption that proceedings which appeared to be warranted were regular, and that the recital was correct. When the regularity of their action was attacked by the introduction of evidence bearing upon it, the burden was on the Commonwealth to establish it. So far as the allegations of the indictment related to conduct of the defendant, the Commonwealth was bound to prove them by extrinsic evidence beyond a reasonable doubt. But in regard to the alleged ignorance of the grand jury, we are of opinion that the jury should consider the evidence in connection with the fact that the action of such a tribunal, under the official oaths of its members, carries with it a presumption of regularity. We see no error in the instruction.

The final instruction of the judge in regard to the statement of the prisoner in his address to the jury was in accordance with the request of the prisoner's counsel, and if there was any error in the original reference to the statement it was corrected in such a way that the defendant was not injured by it.*

*Exceptions overruled.*

---

* On February 21, 1893, the defendant filed in the Supreme Judicial Court a petition for a writ of error, setting forth that on February 14, 1893, he filed with the Superior Court a motion for a new trial, which was overruled on February 18, 1893, and that this action was erroneous, and the petitioner made the following assignments of error in reference thereto :

"First. That the court gave no instructions to the jury upon evidence which, if believed, would have reduced the homicide below murder in the first degree.

"Second. That at the close of the charge the defendant's counsel were informed by the court that it was too late to ask for instructions (meaning instructions other than those presented in writing before the arguments),

whereby they were prevented from calling the attention of the judge to his omission to charge the jury upon any issues raised in the trial and not covered by his charge.

" Third. That it was an error of fact for the justices to believe on the question of bias of a juror the affidavits of the juror as against those offered by the defendant, and if they did not so believe the affidavits of the juror and believed the affidavits offered by the defendant it was error in law for them to overrule the defendant's motion.

" Fourth. That it was error of fact for said justices to find that said juror was qualified to act, because such finding was against the evidence and the weight of the evidence ; and it was error in law, because it involved and abridged the rights of the defendant under the Constitution of this Commonwealth and of the United States which he is entitled to have finally passed upon by this court." ·

Hearing on February 21, 1893, before *Field*, C. J., *Allen*, *Holmes*, *Morton*, and *Lathrop*, JJ.   The following was the opinion of the court.

FIELD, C. J.   The petition does not show that the justices of the Superior Court who heard the motion for a new trial, being the same justices who presided at the trial, in overruling the motion, made any ruling upon any question of law.   We do not know what they found the facts to be with reference to the allegations contained in the motion.   Upon the evidence exhibited before them, they in their discretion refused a new trial.   We cannot revise the exercise of this discretion on a writ of error.

*Petition denied.*