[No. 21084.  In Bank.—December 22, 1894.]

THE PEOPLE, RESPONDENT; v. LOUISA WORTH-INGTON, APPELLANT.

CRIMINAL LAW—HOMICIDE—CROSS-EXAMINATION OF WITNESS FOR PROSE-CUTION.—Upon the trial of a defendant accused of murder, the animus of a witness for the prosecution may be tested on cross-examination, and it is error to refuse to allow questions to be answered which would tend to explain the relations of the witness toward the deceased, and to prove a spite against the defendant for having killed the deceased.

ID.—IMPEACHMENT OF WITNESS FOR DEFENDANT—CROSS-EXAMINATION UPON IMMATERIAL MATTER CONCLUSIVE.—Where a witness for the defendant is asked on cross-examination if he made a statement which was imma-terial and not binding upon the defendant, his denial that he made such statement is conclusive, and he cannot be impeached by the testi-mony of other witnesses, against the objection of the defendant, that he did so state.

ID.—DEFENSE OF INSANITY—EVIDENCE—WEAKNESS OF MIND.—Upon the trial of a woman accused of murder, her family physician, called by the defendant to prove insanity, may be asked whether, from his treatment of her for her ailments and all he knew of her, she was of ordinary good mind or was what he would ordinarily call a weak-minded woman.

ID.—EVIDENCE—HYPNOTISM.—Testimony as to the effect of hypnotism upon those subject to such influence is not admissible upon the trial of a

defendant accused of murder where there is no evidence tending to show that the defendant was a subject of hypnotism, aside from the mere fact that she was told to kill the deceased.

ID.—DECLARATIONS OF DEFENDANT—INSANITY—INSTRUCTION.—Where the husband of the defendant is allowed to testify as to her declarations, and to a conversation between them, to show that she was insane, the court may properly charge the jury that such declarations were only admissions to show the mental condition of the defendant, and that her declarations could not be regarded as proof of the facts stated or of her belief in them.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial.

The facts are stated in the opinion.

*Robert Ferral*, and *Burnette G. Haskell*, for Appellant.

The question asked of the witness, Annie Kelly, as to what she meant by what she had before testified to, should have been allowed, for the reason that the defendant had a right to show by the witness the latter's feeling towards defendant. (*People* v. *Benson*, 52 Cal. 381; *Luhrs* v. *Kelly*, 67 Cal. 292; Wharton's Criminal Evidence, secs. 476, 477; Greenleaf on Evidence, sec. 450.) The question asked the family physician as to whether, from his treatment of the defendant, she was of an ordinarily good mind or a weak-minded woman, should have been allowed, as the witness was competent to answer, both as a medical expert, and as an intimate acquaintance. (*Estate of Toomes*, 54 Cal. 512, 513; 35 Am. Rep. 83; *Estate of Carpenter*, 94 Cal. 414, 415; *Marceau* v. *Travelers' Ins. Co.*, 101 Cal. 338; Code Civ. Proc., sec. 1870, subds. 9, 10.)    It was error for the court to refuse to allow testimony to be given as to the effect of hypnotism upon those subject to its influence. (*Fain* v. *Commonwealth*, 78 Ky. 183; 39 Am. Rep. 213; *Marceau* v. *Travelers' Ins. Co.*, 101 Cal. 338.)

*Attorney General W. H. H. Hart*, and *Deputy Attorney General William H. Layson*, for Respondent.

Temple C.—The defendant was convicted of the crime of murder in the second degree, and sentenced to be imprisoned in the state's prison for the term of twenty-five years.

Her motion for a new trial was denied, and she appeals.

The defendant is a young married woman, having been born in England in 1870. She was the mother of two children. In January, 1893, she met the deceased while he was doing some plumbing on the premises where she resided. Her husband was then absent in Europe. Illicit relations were immediately established between herself and Baddeley. In February the husband returned, and soon after defendant eloped with Baddeley, taking with her her youngest child. They went to Stockton, where, after about ten days, Baddeley deserted her, leaving her entirely destitute. The husband had, in the mean time, got on the track of her and took her home. He forgave her, so he says, because of the children, and because he thought she was not right in her mind.

Annie Kelly had been a servant in defendant's family, and when Mr. Worthington went to Europe he employed her to stay with the defendant. Annie knew all about the illicit relations between defendant and deceased, and, as she testified, acted as a " go between" for them.

After defendant had been forgiven and taken back by her husband she continued to correspond with Baddeley, both directly and by procuring Annie Kelly to write to him for her. She assured him of her continued regard and urged him to return.

In one letter to Baddeley, written March 18th, she said: " He (her husband) said that he will give me a week's time in which to find you, and when I do I must shoot you or be shot myself. So what am I going to do? I am sure I don't know what to do unless I shoot myself. I think that is the best thing to do. I would not give you away to save my life. I love you too much to do that."

April 26th Baddeley, who had been away for a month or two, returned to San Francisco, and on the same day had a clandestine meeting with defendant. The meeting was by appointment, and was arranged through Annie Kelly. The record does not disclose the nature of the interview. The next day Baddeley called upon defendant during the absence of her husband, and, as defendant told her husband, tried to ravish her, whereupon she fired at him three times with a pistol. On the 1st of May, according to her story to her husband, Baddeley met her on the street and again proposed a renewal of the illicit relation. The next morning Mr. Worthington saw Baddeley in the street watching his windows, and went out and procured a pistol for his wife; he gave it to her, at the same time telling her: " You protect yourself: protect your honor; I have brought you home and agreed to forgive every thing"; and further, " Here is a gun; you protect yourself, and if he interferes with you, or attempts to interfere with you again, you kill him and I will do the same."

That evening at about half past four o'clock deceased was seen on the wharf leaning against a pile of sacks. The defendant walked up to him and fired four shots at him from a pistol, when she was interfered with and arrested. She seemed not at all excited. Three shots took effect on the deceased, causing his death.

The defense was insanity and hypnotism.

Annie Kelly was an important witness for the prosecution. She testified as to the improper relations which existed between defendant and Baddeley, of devices on the part of the defendant to deceive her husband. The evidence tended to show, and was evidently introduced for the purpose of showing, depraved conduct on the part of defendant, that she was not seduced from a state of innocence by the deceased.

A number of letters were read in connection with her testimony, which she claimed were written by her at the instance of the defendant, and addressed to Baddeley. They were mostly written during the short

period that the deceased was absent from the city. They assured deceased of the great affection of defendant for deceased, and implored him to return to her. As Baddeley did return and was soon thereafter killed by defendant the effect they were likely to have is obvious.

There were in the letters many expressions of affection for Baddeley on the part of Annie Kelly herself. She sometimes implores him to return for her sake, and also expresses great disgust for her friend Dolf, for having loved whom she says she must suffer. In one letter she used the expression, "I must tell you I am disappointed, for the quicker I have it the better for me."

Defendant's counsel asked: "What do you mean by that"? It was objected to as not cross-examination. Defendant's counsel then explained that he wished to show by it that the relation of mistress and lover existed between the witness and the deceased, in order to show the animus of the witness. The objection was still insisted upon that it was not cross-examination. No other objection was made, and it was sustained.

The intent was doubtless to show that the remark referred to a criminal operation upon herself which the witness contemplated. If this were shown it would tend to explain the urgent requests to Baddeley to return, and also to prove a special spite against defendant for having killed her lover.

The best comment upon this ruling is found in 1 Greenleaf on Evidence, section 446: "The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests which the law has devised for the discovery of truth. By means of it the situation of the witness with respect to the parties, and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description are all fully investigated and ascertained and submitted to the consideration of

the jury before whom he has testified." To investigate just such matters as that is one of the best reasons for allowing cross-examinations at all.

Mr. Worthington, testifying for the defense, said that in his efforts to find where his wife was he called upon the Baddeleys. He there had some conversation, which he related. He was allowed to do this because he said he had related it to his wife, and the question of her sanity was being investigated. On cross-examination the people were allowed, over the objection of the defendant, to ask him if he did not in that conversation say that he once asked his wife to go to the Midwinter Fair, and that she did not go because she had a headache. He replied, denying that he had said so. The prosecution then called two witnesses, who testified against the objection of defendant that he did so state.

This was clearly error. The materiality of the evidence consists in the fact that another witness had said that defendant feigned headache to excuse herself from going to the fair, so that she might have an opportunity for a clandestine meeting with Baddeley.

Admitting that Worthington could have been asked on cross-examination if he made the statement, because the remark was made in a conversation of which he had related a portion, still it was not binding upon his wife. His admission was not evidence against her. It was, therefore, immaterial whether he made the remark or not, and his denial was conclusive.

The family physician was called by the defense to prove insanity. He testified to having assisted at the birth of the two children, and that he also attended defendant for womb trouble. He was well acquainted with defendant and her ailments. He was also an expert upon the subject of mental disease. He was allowed to give testimony as to many peculiarities of the defendant, and he was asked: "From your treatment of her, from her ailments, and all you know of her, was she of an ordinarily good mind, or was she what you would ordinarily call a weak-minded woman"?

This was objected to on the ground that it was irrelevant and immaterial. The objection was sustained, and defendant excepted.

Apparently the objection was sustained on the ground that the test of legal responsibility was whether the accused was capable of knowing right from wrong, and not whether she was weak-minded. This is true; but here it is alleged as a defense that at the time of the homicide defendant was insane, and therefore had not the capacity of knowing that the act was wrongful. To this inquiry the character and quality of defendant's mind is a material fact. It was a fact which might have a favorable or unfavorable effect to the defense according to circumstances. Action which would seem strange or abnormal in a person of strong mind might not seem so in a person of weak mind. So, too, it might show a person predisposed to certain species of mental disease. The evidence of insanity in the case was certainly of the weakest, yet the counsel had a right to submit it to the jury, and I think the witness should have been permitted to answer the question.

Counsel offered testimony as to the effect of hypnotism upon those subject to such influence. The court ruled out the evidence, and, I think, rightly. There was no evidence which tended to show that the defendant was subject to the disease, if it be such. Merely showing that she was told to kill the deceased and that she did it does not prove hypnotism, or, at least, does not tend to establish a defense to a charge of murder.

The defendant did not testify as to any material fact in the case. But in order to show that she was insane, her husband was allowed to testify as to what he had told her, and what she had told him. In this way her story, if it was her story, was got before the jury.

The court then charged the jury in effect that this testimony was put in merely to show the mental condition of the defendant, and that her declarations thus introduced could not be regarded as proof of the facts stated, or of her belief in them. This was correct. The

declarations lacked the sanction of an oath, and should not have been considered by the jury except in connection with the claim that the defendant was insane.

I see no objection to any of the instructions. Those refused were in substance given elsewhere.

For the errors noted I think the judgment and order should be reversed.

HAYNES, C., and SEARLS, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed, and cause remanded for a new trial.

> VAN FLEET, J.,    DE HAVEN, J.,
> GAROUTTE, J.,    HARRISON, J.,
> FITZGERALD, J.

Rehearing denied.