STATE, RESPONDENT, v. BERBERICK, APPELLANT.

(No. 2,590.)

(Submitted February 16, 1909.  Decided March 6, 1909.)

[100 Pac. 209.]

*Criminal  Law—Homicide—Confessions—Admissibility—Insanity—Evidence—Instructions.*

Homicide—Confession—Admissibility—Evidence.
    1.   Evidence adduced in a prosecution for murder, examined and *held* not to show that a confession made by accused was made "under the influence of the flattery of hope and the coercion of fear," but was voluntary, and therefore admissible.
Same—Confession—Admissibility—Question for Court.
    2.   The question of the admissibility of a confession alleged to have been made by defendant while in custody, is one to be determined by

the court after hearing evidence, in the presence of the jury, relative to the circumstances under which it was made, and its finding thereon will not be disturbed on appeal, unless clearly against the weight of the evidence.

Same—Confession—Incompetent Witness—Evidence—Exclusion—Error.

3.   Before the confession of one on trial for homicide was admitted in evidence his counsel offered proof that at the time of making it the defendant was of unsound mind. The offer was rejected. *Held,* that the court erred inasmuch as the accused was thereby deprived of the right to show that at the time of making the confession he was not a competent witness (Revised Codes, sec. 7891) ; and the fact that the jury, in passing upon the worth of the confession and the question whether he was capable of committing crime on the date of the murder, had the benefit of the testimony of expert and lay witnesses to the effect that defendant was insane, did not render the error nonprejudicial, since the trial judge, in determining the competency of the confession, was not advised of the mental condition of the defendant at the time he made it.

Same—Confession—Substance of—Witnesses.

4.   Witnesses who did not recollect the exact words used by defendant in making a confession were properly permitted to give the substance of what was said.

Same—Written Confession—Effect of Signing.

5.   Where a confession was taken down in writing, but not in the exact words used by defendant, he, by signing it and adopting the language employed, made it his own.

Same—Opinion Evidence—Mental Condition.

6.   Where the mental condition of defendant, accused of homicide, was a matter to be considered by the jury in determining what weight should be given to a confession alleged to have been made by him, and where witnesses had testified that he was insane or affected with insanity, it was error to sustain an objection to a question asked a lay witness, whether in his opinion, judging from his acquaintance with defendant, the latter was weak-minded.

Same—Insanity—Lay Witness—Sufficient Acquaintance—Discretion.

7.   The court did not err in refusing to permit counsel for defendant to cross-examine an under-sheriff, in whose custody the accused had been for a period of about six months prior to his trial, as to his acquaintance with defendant, before stating that in his opinion the latter was sane. The question whether the witness had sufficient acquaintance with accused to qualify him to testify as to the sanity of the latter, was addressed to the court's discretion, subject to review in case of clear abuse only.

Same—Weight of Confession—Correct Instruction.

8.   An instruction to the jury in a criminal cause that they should treat an alleged written confession precisely as they would any other evidence in the case, that they were not bound to believe the statements contained therein, but should give them such weight as they thought proper, in view of all the other facts and circumstances under which it was made, including defendant's mental condition, his age, intelligence, character, disposition and experience, the fact that he was under arrest at the time, and the statements, threats or promises, if any, made to him, was correct.

Same—Reasonable Doubt—Acquittal—Erroneous Instruction.

9.   In a prosecution for homicide, a charge that if, after a fair consideration of the entire testimony, the jury should entertain any rea-

sonable doubt as to whether decedent came to his death in any other manner than that charged in the information, acquittal should follow, was erroneous; the true rule being that, if the jury have any reasonable doubt that decedent came to his death in the manner charged in the information, acquittal must follow.

*Appeal from District Court, Deer Lodge County; Geo. B. Winston, Judge.*

JOHN BERBERICK was convicted of murder, and appeals from the judgment and an order denying a new trial. Reversed and remanded for a new trial.

*Mr. W. B. Rodgers,* and *Mr. John H. Tolan,* for Appellant.

There can be no question but what, under the circumstances surrounding this confession, it was made both under the influence of the flattery of hope and the coercion of fear, and that therefore it was clearly inadmissible. (*Bram* v. *United States,* 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568; *Brown* v. *Walker,* 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819; *Territory* v. *McClin,* 1 Mont. 394; *Territory* v. *Underwood,* 8 Mont. 131, 19 Pac. 398; *People* v. *Castro,* 125 Cal. 521, 58 Pac. 133; *Banks* v. *State,* 84 Ala. 430, 4 South. 382; *State* v. *Clifford,* 86 Iowa, 550, 41 Am. St. Rep. 518, 53 N. W. 299; *State* v. *O'Brien,* 18 Mont. 1, 43 Pac. 1091, 44 Pac. 399; *Stephen* v. *State,* 11 Ga. 225; *Johnson* v. *State,* 76 Ga. 76; *Smith* v. *State,* 10 Ind. 106; *Commonwealth* v. *Nott,* 135 Mass. 269; *State* v. *Whitfield,* 70 N. C. 356; *State* v. *Crowson,* 98 N. C. 595, 4 S. E. 143; *Hoober* v. *State,* 81 Ala. 51, 1 South. 574; *State* v. *Nagle,* 25 R. I. 105, 105 Am. St. Rep. 864, 54 Atl. 1065; *Peck* v. *State,* 44 South. 760; *Rex* v. *Partridge,* 7 Car. & P. 557.) The language of the county attorney substantially to the effect that it would be better for the defendant to confess, that is to say, that he would derive some advantage therefrom or escape some danger, renders the confession induced or brought about thereby inadmissible in evidence. (*People* v. *Thompson,* 84 Cal. 598, 24 Pac. 386; *People* v. *Barric, supra; Collins* v. *Commonwealth,* 15 Ky. Law Rep. 691, 25 S. W. 744;

*Searcy* v. *State,* 28 Tex. App. 513, 19 Am. St. Rep. 851, 13 S. W. 782; *People* v. *Stewart,* 75 Mich. 21, 42 N. W. 662; *Hoober* v. *State, supra.*) The county attorney, under the laws of our state, is authorized to call witnesses before him and examine into the commission of any public offense. This makes his position similar in many respects to that of an examining magistrate or coroner, and confessions obtained from the defendant by means of such examinations by a person in authority are universally viewed with great suspicion, and are almost invariably rejected by the courts. (*Wilson* v. *State,* 84 Ala. 426, 4 South. 383; *People* v. *Mondon,* 103 N. Y. 211, 57 Am. Rep. 709, 8 N. E. 496; *State* v. *O'Brien, supra; Peck* v. *State, supra.*)

The admission of the confession in evidence against the defendant in the case at bar was a violation of the defendant's constitutional rights under section 18 of Article III of the Constitution of the state of Montana. (*Bram* v. *United States, supra.*) It was also in violation of the fifth amendment to the Constitution of the United States. This amendment was made applicable to the several states by the fourteenth amendment to the Constitution of the United States. (*United States* v. *Hall,* Fed. Cas. No. 15,282; *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; *State* v. *Moor,* Walker (Miss.), 134, 12 Am. Dec. 541.)

Evidence as to the insanity of the defendant, his physical and mental incapacity, was competent and material in determining the question as to whether or not the confession should have been admitted. (12 Cyc. 464; *State* v. *Mason,* 4 Idaho, 543, 43 Pac. 63; *Hoober* v. *State, supra; Peck* v. *State, supra; Flagg* v. *People,* 40 Mich. 706.)

*Mr. Albert J. Galen,* Attorney General, and *Mr. W. H. Poorman,* Assistant Attorney General, for Respondent.

The object of all evidence is to elicit the truth, and there is neither logic nor reason in rejecting a confession on the ground and for the reason that the confessor had the opportunity to lie, for all witnesses have that opportunity. There is no presump-

tion in law that any witness is a perjurer; if there was he would not be permitted to testify, for truth, not perjury, is the sole purpose of a trial. A defendant is no exception to this rule for he may be a witness and may testify. "The more practical rule would be to receive confessions without question, unless they are shown to have been improperly induced, especially since a contrary rule may involve the difficulty of proving a negative." (1 Wigmore on Evidence, sec. 860.) The admissibility of a confession is solely a question of law for the court. (*State* v. *Sherman,* 35 Mont. 512, 119 Am. St. Rep. 869, 90 Pac. 981.) A confession is not excluded because of any illegality in the method of obtaining it. (1 Wigmore on Evidence, sec. 823.) The test is, "Was there an inducement of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity?" (*Id.,* sec. 831.) The material facts appearing in the confession were corroborated by other evidence, and the rule stated in 1 Wigmore on Evidence, section 856, that in such event the confession may be accepted without hesitation, is applicable.

Mere weak-mindedness is no defense. Insanity means more than this. (12 Cyc. 164 *et seq.;* 22 Cyc. 1113.) "A low order of intelligence does not tend to prove insanity." (*Powell* v. *State,* 37 Tex. 348.) The evidence in this case was general insanity. There being no evidence of special dementia or any special form of insanity, the court did not err in refusing to give instructions covering them. (*Carr* v. *State,* 96 Ga. 284, 22 S. E. 570; *People* v. *Hubert,* 119 Cal. 216, 63 Am. St. Rep. 72, 51 Pac. 329; *People* v. *Griffith,* 146 Cal. 339, 80 Pac. 68; *People* v. *Willard,* 150 Cal. 544, 89 Pac. 124.) Nor did the court err in refusing to give a proposed instruction relating to insanity of the defendant at the time of trial. (*People* v. *McCarthy,* 115 Cal. 255, 46 Pac. 1073; *People* v. *Lee Fook,* 85 Cal. 300, 24 Pac. 654; *People* v. *Coffman,* 24 Cal. 231.) Neither was it proper for the court to instruct the jury that they should make a finding as to the sanity or insanity of the defendant at the time of making the confession, and then disregard the confession,

if they found the defendant insane at that time. (*People* v. *Fallon,* 149 Cal. 287, 86 Pac. 689.)

MR. JUSTICE SMITH delivered the opinion of the court.

The state of Montana accused the above-named defendant and one Frank Carpenter of the crime of murder. Separate trials were demanded, and this defendant was convicted of murder in the second degree. He appeals from the judgment of conviction and also from an order denying him a new trial.

At the time of the commission of the alleged offense Berberick was about eighteen and Carpenter fifteen years of age. On January 14, 1907, the dead body of John Johnson was found near the manure pile at the ranch of George Parrott, about seven miles east of the city of Anaconda. Tracks were found in the snow about the place, and several witnesses testified to having seen Berberick and Carpenter going in the direction of the ranch in the morning and returning in the afternoon. Johnson was an employee of Parrott's and was alone at the ranch on the day in question, Parrott having gone to Anaconda the day before. The weather was extremely cold. Between 2 and 3 o'clock on the afternoon of the 14th the discovery was made that the door of the ranchhouse had been broken open, and an iron safe had been wrecked, apparently with some high explosive. Pieces of giant powder were found. Parrott had no giant powder. Hanging upon a nail in the wall, and covered by a man's cap, was a revolver belonging to Parrott; when he left home on the 13th this revolver contained five cartridges; when he returned on the afternoon of the 14th it contained but one. The autopsy of the body of Johnson disclosed four bullet wounds, and the examining surgeon testified that he died from hemorrhage due to the wounds.

William A. Taylor, the under-sheriff of Deer Lodge county, testified for the state that on the 16th of January the defendant, who was then in custody in the county jail, received a copy of the "Butte Inter-Mountain" newspaper from Isabel Flem-

ing, the sheriff's daughter, who gave it to him at Taylor's request.

Thomas Stewart, the deputy county attorney of Deer Lodge county, testified: That on the evening of the 16th, in the sheriff's office at the jail, in the presence of Taylor, the under-sheriff, Mr. Allen, the coroner, Mr. Cole, a reporter for the "Anaconda Standard" newspaper, and Messrs. Edward Beal and A. N. Strom, Mr. James, the county attorney, asked the defendant if he had sent for him, and received the reply that he had. That Mr. James then told the defendant that, "if his purpose was to make a confession or statement, he would state his rights to him before he should make any statement whatever"; that he (the defendant) "must understand that there was absolutely no hope of reward or promise of any kind held out to him, or promise of leniency or consideration in any way for the fact of his making this confession  *  *  *  ; that before the statement was made Mr. James introduced himself to Berberick and introduced each of the others present, and told Berberick what official capacity each one occupied in this county, if they were officers; that he then proceeded to tell him that there were absolutely no threats made against him; that he was absolutely free to make this statement or not make it, just as he chose; that the fact that he was under arrest need not be considered by him; that if he made a statement it must be absolutely free, without any feeling that he was compelled or forced in any way, or that there was any inducement or hope of any kind held out to him; that he further told him that he was entitled to the aid of counsel, and if he desired an attorney or any friends of his to be present when he would make a statement, if that was his intention, that we would send for any attorney he desired, or for any friends of his that he might desire to have present. *  *  *  He stated that he did not desire any attorney, and had no friends that he cared to send for; that he had sent for Mr. James himself, and that it was his desire to make a statement; that he understood that there was no offer made to him, was no inducement of any kind held out, and he said that he was not

acting under fear of anyone or being compelled by anyone;
that his statement was made freely and voluntarily by him.
*   *   *   It was stated to him that Mr. James was the county
attorney, and it would be his duty to prosecute any action that
might be prosecuted against him, and if he made a statement
that that statement not only could but would be used against him
in prosecution of any action that might be prosecuted against
him on the charge that was against him at that time.   *   *   *
Mr. Cole took down his statement on the typewriter.   *   *   *
I read the statement back to him, and he made some suggestions
as to some changes, and the changes were made.  His rights
were then again stated to him;   *   *   *   that is, that he was
not acting under any duress or under any threats of any kind;
that this statement, if he signed it, must be signed by him freely
and voluntarily; that he must not expect or could not expect
any reward or any leniency or any consideration from the fact
that he had made a confession; that this statement could and
would be used against him; that there were absolutely no offers
made to him; that he would receive no consideration from the
fact that he had made a confession; that it would not aid him
or help him in any way so far as the county attorney's office was
concerned or so far as any consideration was concerned as being
given to him for making a confession; that he was to act freely
of his own will and without the sanction or the force or influ-
ence of any person.   *   *   *   He signed the confession at
that time in the presence of the persons I have named.   *   *   *
After the statement had been made to him as to his rights, he
stated that he had read the confession of Carpenter as pub-
lished in the 'Inter-Mountain' of that same evening.''

Stewart's testimony was, more or less, corroborated by Strom,
Beal, Cole, Allen, James, and Taylor.  Strom also testified:
''James might have said at the time that it would be better for
Johnny to confess, or words to that effect; I would not say.
There might have been a similar statement to that made.  Mr.
James might have said to him, 'So, Johnny, you have concluded
it is best for you to confess,' or words to that effect; I would

not say for sure; I could not say anything about that. ⸱ There might have been some similar statement. * * * Well, I kind of think there was something like that said. That is my best recollection, that there was something like that said.'' Beal and Allen testified that they did not remember and did not believe that Mr. James made such statements. Mr. Cole testified: ''The defendant did not dictate the statement in just the way it appears there, that was not his exact language, but the statements there are substantially correct. The language used by James and the defendant was to some extent interwoven. * * * The statement, however, is substantially as he made it; perhaps not in the exact words, but is practically the same thing. It may be that there are lots of words, or some words, that were used there that night in making the statement that are not down in that statement, and I believe it to be true, according to my own recollection at this time, that there are some words in there that the boy never used. When the boy came in there he appeared very cold and calm and quiet. I do not think he smiled or changed his face in any way or showed any emotion. There was a slight flicker of a smile on his face at one time during the interview, and that was just merely passing, that was the only thing that would show that he—well, to show any emotion.'' Mr. Allen, the coroner, testified that on the morning of the 15th he was present with the jailer when the county attorney questioned Berberick at the jail; and Taylor testified that when James came out of the jail he brought out a statement that he had taken down, and stated ''that he had not been able yet to get the boys to confess, or words to that effect.'' Taylor also testified that the confession of Carpenter was obtained on the morning of the 16th, and that he told Berberick that Carpenter had confessed. He said: ''I told him that, I expect, for the purpose of having an effect on his mind, so that he might, if he would, * * * make some kind of a confession or statement. * * * I sent in the copy of the 'Inter-Mountain' of the 16th so that Johnny could read what the other defendant testified or swore to, the confession the other

boy had made. I did it to see if he would admit it himself, admit that he was connected with it. Then I asked him what he thought about his pal's cough-up. I wanted to see what effect the 'Inter-Mountain' had had on him, to see whether he was ready to admit any connection with the crime. I asked him if he wanted to make a statement, and he said then to send for the county attorney." Mr. James testified that he had an interview with Berberick at the jail on the morning of the 16th in presence of the coroner and the jailer; that he advised the defendant of his rights and privileges at that time, told him that any statement he made must be voluntary, without fear or inducement, and would be used against him; that Berberick made a statement at that time which Mr. James reduced to writing; that he was then advised that he "did not have to sign it unless he wanted to"; that he hesitated a moment and then declined to sign it. The county attorney testified, also, that during this morning conversation he told Berberick that he had a statement from Carpenter, called his attention to a discrepancy between the two statements, and may have used language indicating that if he would state where he was on the 14th that would enable the county attorney to decide whether or not he was the man wanted.

The defendant's counsel then offered in evidence, for the sole purpose of determining the admissibility of the confessions and in support of their objections thereto, a copy of the "Inter-Mountain" of January 16th, containing the confession of Carpenter. In this confession Carpenter stated circumstantially and in detail the movements of himself and Berberick on January 14, how Berberick shot Johnson four times with the revolver found on the nail under the cap in the house, how they blew up the safe, and were immediately afterward frightened away. Counsel then offered to prove by defendant's sister and other witnesses the life and experiences of the defendant from an early age; that his father died at the age of thirty-three years of mental and spinal disease; that relatives on the father's side were insane; that his stepfather was very harsh and cruel

with him; that he had injured his head when a small boy; that as he grew older he became moody, despondent, and inattentive to what was going on around him; that he had fainting spells, talked of committing suicide, and finally ran away from home; that it was agreed in the family that he was crazy; and that at the time the confession was made "the boy was of unsound mind, affected with insanity, crazy." The court rejected the offer.

Formal objections to the admission in evidence of the confessions were then filed, the grounds of which will be hereafter noticed. The court sustained the objections as to the copy of Carpenter's confession and the alleged confession of Berberick made on the morning of January 16, and overruled the objections to the confession made on the evening of that day. This last confession was then read to the jury. It is a detailed narrative of the movements of Carpenter and defendant on January 14, admits the killing of Johnson by the defendant, and is substantially the same as Carpenter's confession. Both Carpenter and the defendant stated that they obtained whisky at a roadhouse on the way to Parrott's ranch. The employees of the roadhouse denied this. It appears later in the state's rebuttal testimony that the authorities had been making some inquiries relative to the sale of whisky to the boys on the day in question. Berberick's confession is prefaced and concludes with statements that it is made freely and voluntarily, without any promise or hope of reward, and with the knowledge that it may be used against him. Both confessions, except as to the matter of obtaining whisky, fully corroborate the state's witnesses, who testified to having seen the boys on the 14th between Anaconda and the Parrott ranch. After the state rested its case, the defendant introduced testimony of experts and laymen to the effect that in their opinion Berberick was weak-minded on January 14th and at the time of the trial, and was insane. This testimony was rebutted by the state. Comprehended therein were all the matters included in the defendant's

offer of proof made before the confession was received in evidence. The defendant did not testify.

1. The first point made by appellant's counsel is that the confession of Berberick "ought never to have been admitted, because there can be no question but what under the circumstances surrounding his confession it was made under the influence of the flattery of hope and the coercion of fear." They cite *Bram* v. *United States,* 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, *Territory* v. *McClin,* 1 Mont. 394, *Territory* v. *Underwood,* 8 Mont. 131, 19 Pac. 398, and several other cases in support of their contention. Let it be noted at the outset that the testimony of Strom as to what James told Berberick on the evening of the 16th (which testimony, by the way, was not very positive) was contradicted by Allen and Beal. It thereafter became the duty of the trial court to decide whether any such statement was in fact made, and, the confession having been admitted in evidence, the presumption must be that the court found that no such statement was made. This conclusion is also borne out by the testimony of the county attorney himself. Eliminating this testimony, we have left in the record for consideration only the evidence of the county attorney as to what he said to Berberick in the cell on the morning of the 16th. As to this testimony counsel for the defendant say in their brief: "In this first conversation the county attorney in effect assured the defendant that it would be better for him to make a statement, or that it would be to his advantage. No other reasonable interpretation of the language used by the county attorney can be made." Particular stress is laid upon this evidence of the county attorney, and we quote it because it is important: "I do not recall that I said anything to Berberick about his being the man they wanted, and as to whether I said anything to him about his not being the man I wanted. I cannot recall making any such statement as that. I might have told him that this statement, showing where he was on the 14th, would show whether or not he was the man wanted, or language to that effect. I may have made such a statement as that, but

if I did I cannot recall it. I would not say that I more than likely did make such a statement as that. I might have made such a statement, but I cannot recall it; and, if I did, I certainly would endeavor to.

"Q. That is, you may have said in substance to him that by his explanations of where he was, or anything else, he might not be the person you wanted for this crime? A. No, I would not say that I said that in substance in any·such manner. I would say that I did not say anything in that manner, that I did not say that in substance.

"Q. Did you say to him, if a person could show you that he was not there, then he was not the man you wanted, something like that? A. I may have used language that would indicate it, but I do not think that I used those terms. I may have said to him that any statement he made would show where he was ·on that day.

"Q. And that he might not be then the person that you wanted, as you said before? A. My language might indicate that; but I do not recall, however, having made any such statement.

"Q. But you may have made it, something like that, in the course of your conversation, as you said a while ago? A. No, I would not put it that way. I would state that I told him, in substance, that, if he told where he was on the 14th, it would indicate as to where he was on that day; but, as to whether or not that would indicate whether he had anything to do with this killing, or not, I cannot recall that. I do not think I said anything to him about its being a good idea for him to tell me about this matter. In fact, I know I did not say anything about its being a good idea. The word 'idea' never was used." We do not think this testimony will bear the construction placed upon it by counsel for the defendant. We find therein no assurance, either directly or by implication, that it would be better for Berberick to make a confession, or that it would be to his advantage to do so. It may, perhaps, be conceded that under the great weight of authority, if the language employed by the

county attorney could be so construed, any confession subsequently made would be inadmissible. Numerous cases are cited to this effect, and such appears to be the law. Although, as we become, by the passage of time, further removed from those conditions which gave rise to the rule, the opinion is more frequently expressed that there is, in this age, no logical reason why confessions should stand upon any different footing in the administration of the criminal law than any other kind of evidence against the defendant; that every alleged confession should go to the jury, together with all the attendant facts and circumstances tending in any way to throw light upon the mental condition and physical surroundings of the defendant at the time, to the end that they may determine the ultimate question of the truth or falsity of the statements so made. But, adhering to the rule, we find in this case no evidence that any inducements whatever were held out to the defendant.

We must assume that the learned district judge believed the evidence of the witnesses who were present at the jail on the evening of the 16th. That testimony showed that the defendant requested the county attorney to come to him, that he was advised of his right to have an attorney or any friend present, was told that any statement he made would be used against him, was informed that he need have no fear of any consequences arising from his refusal to make a statement and no hope of reward or lenience if he did make one, that he said he understood the situation, and what his rights were in the premises. Cases involving facts showing that threats were made against, or inducements held out to, the defendant, have no application to this case.

In the case of *Territory* v. *McClin, supra,* it appeared that the deputy sheriff, who had the defendant in custody, told him that it would be better for him to confess his guilt, and it appeared from the bill of exceptions: "In addition to the above, further evidence was introduced that a mob of one hundred men were around and about the jail where defendant was confined, at intervals of nearly all one day; that threats were fre-

quently made against the defendant that if he did not confess
he would have one hundred lashes, would be hung, etc.; that
word was brought to defendant that one person confined with
him and recently taken out by the mob had been hung; that
the names of defendant and others confined in the jail and the
addresses of their parents and friends had been taken down by
the deputy who arrested him, in writing, with their knowledge;
that in consequence of these threats and demonstrations defend-
ant was greatly excited and alarmed so that he shed tears; and
further that no evidence was produced that the inducements
held out by the deputy sheriff were at any time withdrawn, or
that the mind of the defendant was at any time freed from the
apprehensions occasioned by said violent threats and demonstra-
tions.''

In the case of *Territory* v. *Underwood, supra,* it appeared
that the defendant was in the custody of an officer on a charge
of obtaining money from the Granite Mountain Mining Com-
pany under false pretenses; the officer told him ''it would be
better for him to go back and tell Captain Plummer, the super-
intendent of the company, all about it; that he thought he would
withdraw it, or ease it as light as he possibly could; that he
thought Captain Plummer would help him out of it, if he would
give his evidence against the other two, for the very reason that
Plummer had told Kelly that he would do so, and he thought
he would do so for Underwood.'' The court said: ''These
promises were certainly inducements that clearly vitiate the
confession of the prisoner.''

In *Bram* v. *United States, supra,* the facts were these: The
captain of a vessel was found murdered. The crime had been
committed on the high seas. Brown, a seaman, had, immedi-
ately after the homicide, been arrested by the crew in conse-
quence of suspicion aroused against him and had been placed
in irons. As the vessel came in sight of land, and was approach-
ing Halifax, the suspicions of the crew having been also directed
to Bram, the mate, he was arrested by them and placed in irons.
On reaching port these two suspected persons were delivered

to the custody of the police authorities of Halifax and were there held in confinement awaiting the action of the United States consul, which was to determine whether the suspicions which had caused the arrest justified the sending of one or both of the prisoners into the United States for formal charge and trial. Before the examination had taken place, a police detective caused Bram to be brought from jail to his private office, and, when there alone with the detective, he was stripped of his clothing, and, either while the detective was in the act of so stripping him, or after he was denuded, the conversation offered as a confession took place. Before the alleged confession was allowed to be given to the jury, the trial court inquired of the detective as follows: "You say there was no inducement to him in the way of promise or expectation of advantage? A. Not any, your honor. Q. Held out? A. Not any, your honor. Q. Nor anything said in the way of suggestion to him that he might suffer if he did not—that it might be worse for him? A. No, sir; not any. Q. So far as you were concerned, it was entirely voluntary A. Voluntary, indeed. Q. No influence on your part exerted to persuade him one way or the other? A. None whatever, sir; none whatever." The court, over the objection of the defendant, then allowed the detective to testify, as follows: "When Mr. Bram came into my office, I said to him, 'Bram, we are trying to unravel this horrible mystery.' I said: 'Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder.' He said: 'He could not have seen me. Where was he?' I said, 'He states he was at the wheel.' 'Well,' he said, 'he could not see me from there.' I said, 'Now, look here, Bram, I am satisfied that you killed the captain, from all I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' He said: 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' "

Mr. Justice White, writing the opinion of the court, said, *inter alia:* "In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the fifth amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' * * * A brief consideration of the reasons which gave rise to the adoption of the fifth amendment, of the wrongs which it was intended to prevent, and of the safeguards which it was its purpose unalterably to secure, will make it clear that the generic language of the amendment was but a crystallization of the doctrine as to confessions, well settled when the amendment was adopted, and since expressed by the text-writers and expounded by the adjudications, and hence that the statements on the subject by the text-writers and adjudications but formulate the conceptions and commands of the amendment itself. * * * In this court it has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary; but, as one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether or not the statements of the prisoner were voluntary." The court, in holding that Bram's statement was not voluntary, used language which clearly shows that the circumstances considered as having most weight in that case are entirely absent from the case at bar. The court said: "Bram had been brought from confinement to the office of the detective, and there, when alone with him, in a foreign land, while he was in the act of being stripped or had been stripped of his clothing, was interrogated by the officer, who was thus, while putting the questions and receiving answers thereto, exercising complete authority and control over the person he was interrogating. Although these facts may not, when isolated each from the other, be sufficient to warrant the inference that an influence compelling a statement has been exerted, yet, when

taken as a whole, in conjunction with the nature of the communication made, they give room to the strongest inference that the statements of Bram were not made by one who in law could be considered a free agent. To communicate to a person suspected of the commission of crime the fact that his cosuspect has stated that he has seen him commit the offense, to make this statement to him under circumstances which call imperatively for an admission or denial, and to accompany the communication with conduct which necessarily perturbs and engenders confusion of thought, and then to use the denial made by the person so situated as a confession, because of the form in which the denial is made, is not only to compel the reply but to produce the confusion of words supposed to be found in it, and then use statements thus brought into being for the conviction of the accused. A plainer violation as well of the letter as of the spirit and purpose of the constitutional immunity could scarcely be conceived of. Moreover, aside from the natural result arising from the situation of the accused and the communication made to him by the detective, the conversation conveyed an express intimation rendering the confession involuntary within the rule laid down by the authorities. What further was said by the detective? 'Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' But how could the weight of the whole crime be removed from the shoulders of the prisoner as a consequence of his speaking, unless benefit as to the crime and its punishment was to arise from his speaking? Conceding that, closely analyzed, the hope of benefit which the conversation suggested was that of the removal from the conscience of the prisoner of the merely moral weight resulting from concealment, and therefore would not be an inducement, we are to consider the import of the conversation, not from a mere abstract point of view, but by the light of the impression that it was calculated to

produce on the mind of the accused, situated as he was at the time the conversation took place. Thus viewed, the weight to be removed by speaking naturally imports a suggestion of some benefit as to the crime and its punishment as arising from making a statement. This is greatly fortified by a consideration of the words which preceded this language—that is, that Brown had declared he had witnessed the homicide, and that the detective had said he believed the prisoner was guilty and had an accomplice. It, in substance, therefore called upon the prisoner to disclose his accomplice, and might well have been understood as holding out an encouragement that by so doing he might at least obtain a mitigation of the punishment for the crime which otherwise would assuredly follow.''

We have quoted thus at length from the *Bram Case* for the reason that it was decided by the supreme court of the United States, and because it is confidently relied on by the defendant's counsel. Accepting what is there said as to the law, we are of opinion that such law applied to the testimony actually received in this case should not result in a determination that Berberick's confession was not voluntarily made. Indeed, Mr. Justice Brewer, with the concurrence of the Chief Justice and Mr. Justice Brown, dissented from the result reached in the *Bram Case.* He said: ''I dissent because I think the testimony was not open to objection.'' ''A confession, if fairly and voluntarily made, is evidence of the most satisfactory character.'' (*Hopt* v. *People,* 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262, reaffirmed in *Sparf* v. *United States,* 156 U. S. 51, 715, 15 Sup. Ct. 273, 39 L. Ed. 343.) ''The fact that the defendant was in custody and in irons does not destroy the competency of the confession.'' ''Confinement and imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary and was not obtained by putting the prisoner in fear, or by promises.'' (See, also, *Wilson* v. *United States,* 162 U. S. 613, 16 Sup. Ct. 895, 40 L. Ed. 1090.) ''The detective, when called, testified positively that no threats were made nor any inducements held out to Bram, and this general declaration he

affirmed and reaffirmed in response to inquiries made by the court and the defendant's counsel.'' (See, also, *State* v. *Storms,* 113 Iowa, 385, 86 Am. St. Rep. 380, 85 N. W. 610.)

This court held in *State* v. *Sherman,* 35 Mont. 512, 119 Am. St. Rep. 869, 90 Pac. 981, that the question of the admissibility of an alleged confession was to be determined by the court after hearing, in the presence of the jury, evidence of the circumstances under which it was made. Particular attention was called in that case to section 3441 of the Code of Civil Procedure of 1895 (Revised Codes, sec. 8055), providing that all questions of the admissibility of testimony and the facts pertaining to such admission shall be decided by the court. (See, also, 1 Wigmore on Evidence, sec. 487.) In this case the court followed the course of procedure indicated in the *Sherman Case,* and it may be as well to say in this connection that we see no reason for applying any different rule to the decision of the trial court on the facts pertaining to the admission of testimony than is applied to any other determination of fact by that court. Facts so found will not be disturbed unless they are clearly in conflict with the weight of the evidence on the subject. Whether a confession was prompted by some inducement of hope or fear is a question of fact. We have no hesitancy in saying here, however, that, so far as the evidence actually received is concerned, we agree with the conclusion reached by the district court. (See, also, *Maull* v. *State,* 95 Ala. 1, 11 South. 218.)

2. The contention that the county attorney was acting in a capacity similar to that of an examining magistrate is not borne out by the testimony.

3. But counsel offered to prove, before the confession was admitted in evidence, that at the time of making it the defendant was of unsound mind. Let us inquire into the effect of this offer. The following is section 479 of 1 Wigmore on Evidence: ''The use of the phrase 'testimonial evidence' must not be understood as applicable exclusively to assertions made on the witness-stand. Any assertion, taken as the basis of an inference as to the existence of the matter asserted, is testimony, whether

made in court or not. Thus all the statements received under the exceptions to the hearsay rule are genuinely testimony. Assertions made on the witness-stand are merely the commonest class of testimonial evidence. It follows that the qualifications of a witness are equally essential in the use of extrajudicial assertions.'' In the case of *State* v. *Haywards,* 62 Minn. 474, 65 N. W. 63, the supreme court said: ''According to the modern doctrine, inmates of lunatic asylums, and other persons conceded to be insane when offered as witnesses, may be held competent. Such persons are presumed to be incompetent as witnesses, and, if challenged for incompetency, it is the duty of the judge to examine into the question as a preliminary matter, and if he is of the opinion that the witness is so insane that he has not sufficient capacity to understand the obligations of an oath, to perceive what occurred, and remember and narrate what he perceived, then he should hold him incompetent; but if the judge is of the opinion that the witness has this capacity, he may hold him competent and leave the question of his credibility to the jury.''

In *District of Columbia* v. *Armes,* 107 U. S. 519, 2 Sup. Ct. 840, 27 L. Ed. 618, the supreme court of the United States said: ''The general rule, therefore, is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself, and competent witnesses who can speak of the nature and extent of his insanity.''

In the case of *Regina* v. *Hill,* 5 Cox C. C. 259, this principle was laid down, and Mr. Justice Talfourd said: ''In every case the judge must determine according to the circumstances and extent of the delusion.''

The court said in *Kendall* v. *May,* 10 Allen (Mass.), 59: ''The rule * * * is that it is for the judge to satisfy himself

whether the witness understands the nature of an oath and is
capable of testifying.   He then decides upon the competency of
the witness, and if he admits him, it is left to the jury to esti-
mate the value of his testimony.''

The supreme court of Virginia, in *Coleman* v. *Commonwealth,*
25 Gratt. 865, 23 Am. Rep. 711, said: ''A witness is not ex-
cluded merely because he is a lunatic.   That is not enough *per
se* to exclude him; but he must at the time of his examination
be so under the influence of his malady as to be deprived of
that 'share of understanding' which is necessary to enable him
to retain in memory the events of which he has been witness, and
gives him a knowledge of right and wrong.   If at the time of
his examination he has this share of understanding,- he is com-
petent.   That is the test of competency, and of such competency
the court is the judge; whilst the weight of the testimony—the
credit to be attached to it—is left to the jury.''   (See, also,
*People ex rel. Norton* v. *New York Hospital,* 3 Abb. N. C. (N.
Y.) 229, and *Spittle* v. *Welton,* L. R. 11 Eq. Cas. 420.)

Messrs. Underhill & Clark, in their article on Criminal Law,
under the subhead ''Confessions—Voluntary Character'' (12
Cyc. 464), say: ''Whether a confession is voluntary depends
largely upon the facts of the particular case.   If it is obtained
by reason of oral threats of harm, by promise of benefit, or by
actions of those in control of the prisoner which are equivalent
to such threats or promises, it is involuntary and incompetent,
and in determining whether it was obtained by such means the
sex, age, disposition, education and previous training of the
prisoner, his mental qualities, his physical health, and his sur-
roundings are elements to be considered.''   The mental quali-
ties of the defendant were noted and considered by the courts
in *Peck* v. *State,* 147 Ala. 100, 41 South. 759; *Hoober* v. *State,*
81 Ala. 51, 1 South. 574; *State* v. *Mason,* 4 Idaho, 543, 43 Pac.
63; *Flagg* v. *People,* 40 Mich. 706; *Burton* v. *State,* 107 Ala.
108, 18 South. 284; *Green* v. *State,* 40 Fla. 474, 24 South. 537.

Section 7890, Revised Codes, provides that all persons, with-
out exception, otherwise than as thereafter specified, who, hav-

ing organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses. Section 7891 provides: "The following persons cannot be witnesses: (1) Those who are of unsound mind at the time of their production for examination." While it appears upon the face of the testimony actually considered by the court that the defendant was not compelled to be a witness against himself, for the reason, as we have seen, that his confession was apparently voluntary, he was nevertheless deprived of the right to show, if he could, that at the time of making the confession, which was afterward given in evidence against him, he was not a competent witness, because, as his counsel offered, in the words of the statute, to show, he was of unsound mind. It is true that the jury had the benefit of the testimony on this subject in passing upon the worth of his confession, and the question whether he was capable of committing crime on January 14th; but the judge had not that light in deciding the competency of the confession made by him on the 16th—that is, to say, whether the defendant was a competent witness against himself at the time he made it. If he was not competent to testify, it was his right to have the confession excluded, and it is not to be inferred that, because the jury concluded he was sane on the 14th, the judge would have reached the same decision as to his condition on the 16th.

The attorney general calls our attention to the case of *People v. Miller*, 135 Cal. 69, 67 Pac. 12. In that case a witness had testified that a statement by the defendant was voluntarily made. Upon the witness being asked to give the statement, counsel for the defendant requested permission to ask some questions showing the conditions under which the statement was made. The court declined to grant this request, saying they might question him upon cross-examination. The supreme court, after deciding that the trial court should permit a cross-examination for the purpose of showing the particular circumstances under which the confession was made, before permitting the confession itself to go in evidence, held that it appeared from the record that

the defendant was not prejudiced by the ruling. The opinion then concludes: "Testimony was given upon the cross-examination and also by other witnesses tending to show that by reason of a bullet wound in his head the defendant was not in the full possession of his faculties at the time he made the statement. This, however, did not affect the admissibility in evidence of the confession itself, but was evidence to be considered by the jury in determining the weight or effect to be given to it." We do not understand from the opinion exactly how or when the question was raised, but it nowhere appears therein that before the statement was received in evidence any offer was made to prove that the defendant was not a competent witness. But it does appear that the testimony as to his physical condition was received, and, of course, it then became the duty of the jury to weigh and consider it.

We have discovered in the books another case on this subject, that of *State* v. *Feltes,* 51 Iowa, 495, 1 N. W. 755. The court said: "Evidence that the defendant at the time of the alleged confession was intoxicated or insane was proper to impair or destroy the effect of the confession. The defendant was allowed to introduce such evidence upon cross-examination, but he complains that he should have been allowed to introduce it first. In our opinion the court did not err. It was for the jury to determine what weight should be given to his confession, in view of his mental condition as shown. The court, therefore, could not properly have excluded evidence of the confession. Nor do we think it was the defendant's right to show his condition first, by way of preparing the mind of the jury against any undue impression from the evidence of the confession. The time when the jury was made acquainted with it must, we think, be deemed immaterial." Counsel for the defendant had asked leave to show by the witness who gave evidence of the confession, and other witnesses, that the defendant was "under the influence of intoxicating liquor and was affected by *delirium tremens,* or otherwise insane * * * to the end that the court might sustain their objection to (the witness) testifying in regard to the confession, if the court should be satisfied that the defend-

ant was affected with *delirium tremens,* or otherwise insane, or, at least, if the testimony was to be received it should be after the jury had been made acquainted with the defendant's condition." It will be observed that the supreme court did not specifically decide that the trial court need not have considered the testimony before passing upon the competency of the confession, but did hold that, so long as the jury had the benefit of the evidence, it was immaterial when it was introduced. Perhaps, as the offer was in the alternative, the ruling may be considered as technically correct. Professor Wigmore, however, in volume 1 of his work on Evidence (section 494, note 1), says that the ruling seems erroneous. At any rate, in view of the authorities and the provisions of our statute, we do not see our way clear to follow it.

In the case of *State* v. *Hill,* 65 N. J. L. 626, 47 Atl. 814, the court said: "When a confession is offered by the state in a criminal case, it is the right of the counsel of the prisoner, before it is admitted, to cross-examine the witness who proposes to testify to it as to the circumstances surrounding the making of it, and the defense may also call, at the same time, independent witnesses and examine them, going thoroughly into the whole matter as to how the confession came to be made, the parties present, the physical condition and state of mind of the prisoner at the time it was made, and then the court, with all these facts before it, is to pass upon its admission. * * * The law always presumes a man to be conscious and sane, and, if the contrary exists, thereby defeating the natural presumption, it must be shown by the party who alleges it. The condition, mental and physical, of a prisoner at the time of the alleged confession, if shown to the judge, may very materially affect his decision upon the question of its admission, and the prisoner has the right to have it all disclosed before the court passes upon it."

We think the defendant should have been allowed to introduce testimony as to his mental condition on the evening of the 16th, before the confession was admitted in evidence.

In the case of *Grayson* v. *State,* 40 Tex. Cr. 573, 51 S. W. 246, it is said: "Article 768, Code Cr. Proc. 1895, provides that

children are not competent to testify in courts, who do not possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath. We think that, by analogy, the above statute might be applied as a test of the admissibility of confessions; that is, if the party against whom the confessions are introduced is shown not to possess sufficient intelligence to make a statement as to the transaction interrogated about, or has not sufficient intelligence to understand the nature and obligation of an oath, that the statement or confession of such witness ought not to be received in evidence.''

4. Exception is taken to the ruling of the court in allowing witnesses who did not recollect the exact words used at the jail on the evening of the 16th to give the substance of what was said. We think the court did not err in this regard. The substance of a conversation is, generally, all that any witness can remember, and we cannot doubt that this is all the law requires in regard to confessions. (1 Greenleaf on Evidence, sec. 218, and 3 Wigmore on Evidence, sec. 2097.) And by signing the confession and adopting the language the defendant made it his own. (*Commonwealth* v. *Coy,* 157 Mass. 200, 32 N. E. 4; *Commonwealth* v. *Hildreth,* 11 Gray (Mass.), 327.)

5. A witness, Edward Richards, was sworn for the defendant. After narrating certain peculiarities in the conduct and demeanor of the defendant during the time of their acquaintance, he was asked this question: ''Mr. Richards, I will ask you, from your acquaintance with him, from what you know of the boy, and all you know of him, whether in your opinion he had an ordinarily good mind, or whether he was weak-minded at the time you knew him?'' The court sustained an objection to the question. We think this was error. Whether the defendant was weak-minded was a matter to be considered by the jury in determining what weight should be given to his confession, and the testimony might also have served to supplement that of the defendant's witnesses who testified that he was insane or affected with insanity. (See *People* v. *Worthington,* 105 Cal. 166, 38 Pac. 689.)

6. Taylor, the under-sheriff, after testifying to his acquaintance with, and observation of, the defendant as a prisoner in the jail during a period of about six months prior to the trial, was allowed to testify, over the objection of defendant, that in his opinion he was sane. We think the court cannot be put in error for admitting this testimony. This court, in *State* v. *Penna*, 35 Mont. 535, 90 Pac. 787, said: ''Since there are all degrees of intimacy, * * * it is sometimes * * * difficult to determine what an intimate acquaintance is. The determination of the relation must be left in every case to the trial court; its discretion in the matter not being subject to review except in cases of clear abuse of it.'' If the trial court was of opinion that sufficient acquaintance had been shown to warrant overruling an objection to the question, no error was committed in refusing permission to cross-examine before the answer was given.

7. Exception is taken to the action of the court in refusing to give to the jury certain instructions requested by the defendant. After reading the instructions given, we are of opinion that, with the exception of those hereinafter mentioned, they fully and fairly stated the law and substantially covered the matters incorporated in all those refused, with the exception of proposed instruction 15.

8. Proposed instruction 15 reads as follows: ''The jury are instructed that an insane person cannot be a witness upon any trial, and that therefore, if you believe from the evidence that the defendant at the time of the making of the confession, which has been introduced in evidence, if he did make such confession, was an insane person, or if you have any reasonable doubt as to whether or not the defendant was insane at such time, then you should not give such confession any weight whatsoever in this case.'' As has heretofore been said, the question of the defendant's competency as a witness at the time of his confession was for the court to decide. Had the court admitted the confession after hearing testimony as to defendant's mental condition, it would then have been the province of the jury to

weigh the confession as they would any other evidence. On this point the court gave the following instruction, which we think is correct: "(42) If the jury believe from the evidence beyond a reasonable doubt that the defendant, John Berberick, made the confession as alleged, and which has been admitted in evidence in this case, the jury should treat such alleged confession precisely as they would any other testimony in the case. You are not bound to believe as true the statements contained in such alleged confession, but may give to them such weight as you think proper in view of all the other facts and circumstances appearing on the trial, and in determining the weight to be given to such alleged confession you may take into consideration all the circumstances under which the same was made, including the age, mental condition, intelligence, lack of intelligence, character, situation, disposition and experience of the defendant, the fact that he was under arrest at the time the same is alleged to have been made, the statements, threats, or promises, if any, made to him at the time, and all the other attending circumstances. The jury are at liberty to judge of it like any other evidence, in view of all the circumstances of the case as disclosed by the evidence, for your power of judging of the effect of evidence is not arbitrary, but to be exercised with legal discretion and in subordination to the rules of evidence."

9. Exception is taken to instruction No. 17, given by the court, as follows: "If, after a fair and impartial consideration of the entire testimony in this case, you entertain any reasonable doubt as to whether the deceased came to his death in any other manner than that charged in the information, then it is your duty to acquit the defendant." While, in the light of other instructions given, this one was probably not prejudicial to the defendant, it is nevertheless erroneous; the true rule being that, if the jury have any reasonable doubt that the deceased came to his death in the manner charged in the information, they should acquit the defendant.

The foregoing disposes, in effect, of all questions involved in the case on appeal.

The judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

